**No. 26-1555**

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

JOSE ACEVEDO, individually, and as a
Special Administrator of the
ESTATE OF JOEL ACEVEDO,

     *Plaintiff-Appellant,*

v.

MICHAEL MATTIOLI and
CITY OF MILWAUKEE, WISCONSIN,

     *Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Wisconsin, No. 23-cv-00489
The Honorable Brett H. Ludwig, District Judge

---

## SEPARATE APPENDIX
## FOR PLAINTIFF-APPELLANT

---

**The LaMarr Firm, PLLC**
B'Ivory LaMarr, Bar No. 1122469
5718 Westheimer Rd., Suite 1000
Houston, TX 77057
(800) 679-4600, ext. 700
blamarr@bivorylamarr.com

**Ben Crump Law, PLLC**
Benjamin L. Crump, D.C. Bar No. 1552623
122 S. Calhoun Street
Tallahassee, FL 32301
(800) 959-1444
court@bencrump.com

**Jacob Litigation, Inc.**
Devon M. Jacob, Pa. Bar No. 89182
P.O. Box 837
Mechanicsburg, PA 17055-0837
(717) 796-7733
djacob@jacoblitigation.com

*Attorneys for the Plaintiff-Appellant, Jose
Acevedo, individually, and as a Special
Administrator of the Estate of Joel Acevedo*

## I.   TABLE OF CONTENTS TO SEPARATE APPENDIX

Mattioli Deposition Transcript Excerpts (ECF No. 56-1) .............................................SA-001

Mattioli Discovery Responses (ECF No. 73-3).........................................................SA-017

Autopsy Report (ECF No. 80-5) ................................................................................SA-039

MPD Policy 220 (ECF No. 73-9)...............................................................................SA-044

Aldrete Deposition Transcript Excerpts (ECF No. 80-8) ...........................................SA-053

FPC Charges (Draft) (ECF No. 80-2).........................................................................SA-072

FPC Charges (Final) (ECF No. 87-3).........................................................................SA-077

## II.   CERTIFICATE OF SEPARATE APPENDIX COMPLIANCE

Pursuant to Circuit Rule 30(d), I certify that the Required Short Appendix filed with Plaintiff-Appellant's Opening Brief and this Separate Appendix contain all materials required by Circuit Rule 30(a) and (b).

Respectfully submitted on June 29, 2026,

**The LaMarr Firm, PLLC**

By: /s/ B'Ivory LaMarr, Bar No. 1122469
5718 Westheimer Rd., Suite 1000
Houston, TX 77057
(800) 679-4600, ext. 700
blamarr@bivorylamarr.com

**Ben Crump Law, PLLC**

Benjamin L. Crump, D.C. Bar No. 1552623
122 S. Calhoun Street
Tallahassee, FL 32301
(800) 959-1444
court@bencrump.com

**Jacob Litigation, Inc.**

By: /s/ Devon M. Jacob, Pa. Bar No. 89182
P.O. Box 837
Mechanicsburg, PA 17055-0837
(717) 796-7733
djacob@jacoblitigation.com

*Attorneys for the Plaintiff-Appellant, Jose Acevedo, individually, and as a Special Administrator of the Estate of Joel Acevedo*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DIVISION

-------------------------------------------------

JOSE ACEVEDO, individually,
and as a Special Administrator
of the ESTATE OF JOEL ACEVEDO,

      Plaintiff,

   -vs-            Case No. 23-cv-00489

MICHAEL MATTIOLI, et al.,

      Defendants.

-------------------------------------------------

Examination of MICHAEL MATTIOLI,

taken at the instance of the Plaintiff, under and

pursuant to the Federal Rules of Civil Procedure,

before ALICIA PABICH, a Certified Shorthand Reporter

and Notary Public in and for the State of Wisconsin,

at Wirth + Baynard, 9898 W. Bluemound Road, Suite 2,

Wauwatosa, Wisconsin, on April 25, 2025, commencing

at 9:36 a.m. and concluding at 1:33 p.m.

---

A P P E A R A N C E S

JACOB LITIGATION, INC., by
MR. DEVON M. JACOB,
P.O. Box 837,
Mechanicsburg, Pennsylvania 17055-0837,
appeared on behalf of the Plaintiff.

THE LAMARR FIRM, by
MR. B'IVORY LAMARR,
5718 Westheimer Road, Suite 1000,
Houston, Texas 77057,
appeared on behalf of the Plaintiff.

WIRTH + BAYNARD, by
MS. JASMYNE M. BAYNARD,
9898 West Bluemound Road, Suite 2,
Wauwatosa, Wisconsin 53226,
appeared on behalf of the Defendant, Michael
Mattioli.

CITY OF MILWAUKEE,
OFFICE OF THE CITY ATTORNEY, by
MR. CLINT B. MUCHE,
841 North Broadway, Room 716,
Milwaukee, Wisconsin 53202,
appeared on behalf of the Defendants, Robert Roach,
Alfonso Morales, and City of Milwaukee.

* * * * *

---

I N D E X

Examination:                        Page
By Mr. Jacob.................................... 4
By Mr. Muche.................................... 140
By Ms. Baynard................................. 156
By Mr. Jacob................................... 167

Exhibits Identified:             Page
Exhibit 16 -Criminal Complaint................. 113
Exhibit 17 -Jury Trial Day Four Transcript..... 144

Disposition Of Original Exhibit/s:
Attached To Original Transcript

---

TRANSCRIPT OF PROCEEDINGS

MICHAEL MATTIOLI, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. JACOB:

**Q. It's Michael Mattioli; correct?**

A. Correct.

**Q. Do you have a middle name?**

A. Anthony.

**Q. And are you a junior, a senior, the third?**

A. No.

**Q. Just one of you?**

A. Just me.

**Q. Got it. Have you ever given a deposition before?**

A. No.

**Q. I mean, I know you went to a trial so you are familiar with testifying in questions and answers, but just to make sure we are on the same page, I'm just going to go through a few things. First of all, the court reporter has two hands, but it's not one for you, one for me. So to the extent that you can let me finish my questions, even if you can tell where**

---

1 (Pages 1 to 4)

65

probation agent and I would see him at work every once in a while. And then Joel, I met him the Northwestern Mutual building in downtown Milwaukee. He was a security guard there, and I would work there off duty as a police officer but on my day off, and that's how I met him.

Q. Now, you said as a police officer, but on your day off. So was that approved off-duty private security work?

A. I guess you could call it private security. I'm not -- I don't know. But I was in full Milwaukee police uniform in the building.

Q. I see. So it was a situation where this business pays the city to use a police officer for a particular function?

A. Yes.

Q. So you're off duty in the sense that it's not your normal schedule; correct?

A. Right.

Q. But you're on duty in a sense that you are in uniform, you are there to function as a police officer; correct?

A. Right.

Q. And, again, you said you met Joel at that time

66

because he was private security in the same location?

A. Right.

Q. Roughly, how long do you think you knew Joel as of -- I keep forgetting our date there -- as of the date of this incident? Let's just go with that.

A. I don't remember exactly, but I want to say I met him about a year before, but I would only see him every once in a while. I would only see him a couple times a year because I wouldn't work there that regularly, and sometimes he wasn't at work while I was there. So I met him about a -- I think about a year before the incident happened, but I -- yeah, that's about it.

Q. So to the extent that there's any question about whether Joel knew that you were a police officer, do you believe there was any question that Joel somehow didn't know that you were a police officer?

A. No. He knew because I -- like I met him while I was in uniform, full uniform.

Q. Okay. He never looked at you in that uniform and said, come on, are you really a police

67

officer?

A. No, he didn't.

Q. All right. So when he was sitting in your house, did he ever say, were you really a police officer while you were working downtown?

A. No.

Q. So there was literally no doubt that Joel knew that you were a full-fledged police officer on the night in question?

A. Right.

Q. Or the day in question. Okay. Now, had Joel said I want to see your ID because I don't believe you that you are a police officer now that you've arrested me, assuming that you arrested him, would you have shown him?

A. I don't know. I mean, that's kind of a -- that's an odd question, but --

Q. I know, but if he said I'm not cooperating unless you show me your actual ID, would you have shown it to him?

A. I don't see why not.

Q. Okay. And you could have because it was in your house in the next room on your desk in your office; correct?

A. Well, if you are talking about the situation

68

while we are all here.

Q. No, I'm saying in general.

A. In general?

Q. If he had asked, you could have?

A. In general?

Q. Yes.

A. Not in -- not in this situation?

Q. Correct.

A. So in general, yes, I could, but --

Q. Okay. Now, when this incident occurred when there's this struggle between Joel and yourself, what were you wearing?

A. Just jeans and a T-shirt, no shoes, socks.

Q. And what was that T-shirt?

A. I remember it was a memorial T-shirt for one of the officers that was killed, an officer that I knew, and that was the T-shirt.

Q. And it also had an MPD badge insignia over your left chest?

A. Yes.

Q. And a tactical enforcement design on the back?

A. Yes.

Q. And it was the Officer Matthew Rittner memorial shirt?

A. Right.

17 (Pages 65 to 68)

69

Q. So to the extent that Joel suddenly forgot that you were a police officer, looking at you he would have seen you wearing something that indicates you are a police officer, too; correct?

A. That's possible, yes.

Q. Now, did -- the other people there with you, do you know if they knew you were a police officer?

A. Yes. Yes, everybody knew.

Q. And how do you know that they knew?

A. Well, Andy, I've seen him while I was at work before, so he's seen me in uniform -- or I saw -- I've seen him in the jail before, so he knows that way. Christopher, he just -- he knew because I told him and it's just kind of common knowledge.

Q. Okay. So the four of you in a room, there is absolutely no question that everybody in that room knew that Mr. Mattioli is a police officer?

A. That's right.

Q. At this gathering, there are persons who are consuming alcohol. I think you said you were one of them; correct?

70

A. Yes, all of us were.

Q. And how about illegal drugs? Do you know if -- at the time, did you know whether there were persons taking drugs that were not lawful?

A. No.

Q. Now, something happens; am I correct? You go to sleep at some point in the night; correct?

A. Yes.

Q. And before you went to sleep, though, was everyone getting along?

A. Yes. It was a normal -- normal night. Like I said, it was kind of a boring night. We didn't -- there was no conflicts of any sort whatsoever. It was a friendly, boring night, really.

Q. What were you guys doing? Just sitting around and talking, watching TV, playing games? What were you doing?

A. We were outside by the fire for the beginning of the night. Eventually, we came inside and sat around my kitchen table and just talked. I don't know. I think maybe the guys were playing cards. I wasn't playing cards myself, just talking.

Q. Okay. You guys eating food?

71

A. I don't think we ate anything.

Q. Okay. Anybody come and go to visit, or just was it always just the four of you?

A. No. It was just the four of us.

Q. At some point I think it's my understanding everybody goes to sleep, but in different places within the home?

A. Right. Well, I don't know for a fact that everybody slept. I know I went up to my bedroom and I went to sleep, and I know Andy went to sleep on the couch in the first floor living room. But as far as Christopher and Joel actually sleeping, I don't know if they did.

Q. Was it the intent that everybody would sleep there, or was it just, ah, we've had stuff to drink, let's just crash for the night kind of thing?

A. For -- it was kind of implied that everybody would sleep over, yeah. That was my understanding that people would sleep over. I know Christopher and Andy had slept over in the past, so it was implied for them. Joel had never been in my house before, this was the first time he had ever been in my house, so at

72

some point during the night he asked me if it was okay if he slept over, and I said absolutely because we've all been drinking, stay here, no problem.

Q. And do you know where he went in the home -- when you went upstairs, do you know where he was?

A. No.

Q. Okay. So you go to sleep, everything is calm when you go to sleep, what happens next?

A. The next thing after I went to sleep is I woke up because I felt Joel going through my pockets in my pants when I was sleeping.

Q. And so what happens?

A. I woke up because I felt somebody touching me. So I woke up and I was laying on my back, I sat up, and I was startled because it was somebody just touching me in my sleep, it was strange, and somebody was in my pocket. So I sat up and I looked and I saw that it was Joel. He quickly took his hand out of my pocket and took a step back. The bedroom was dark, the lights were off, it was still early in the morning, the sun was just coming up, I think.

And I asked him, I said, "What are

Cream City Reporting, LLC
414.585.8128

73

you doing?"  Just like that, I said, "What are you doing?"  And he didn't say anything to me, he was just silent and just stood there over me.  So the next thing I said to him, I said, "Really, you are just going to steal from me like that?"  And when I said that, he got angry, really angry and irate and started yelling at me.  While I'm still laying in bed and he's still standing over me, he was yelling and moving fast.

And I could tell by his energy level and his movement that he hadn't slept.  And that worried me because I thought he was sleeping, I thought everybody was sleeping.  So he said -- when I asked him, "You are going to steal from me like that?"  He started yelling at me and saying things like, "No, I didn't.  I wasn't stealing from you.  I wasn't stealing from you," but yelling it.

And while he was doing that, he was taking everything out of his pockets and, like, throwing it at me, saying, "Look, I didn't steal anything from you."  Whatever he had in his pockets he was throwing at me on top of me on my bed.  Yeah, that's what happened.

74

Q.  And what did you have in your pockets at the time, if anything?
A.  I don't remember.
Q.  Did you have your wallet in your pocket, do you think?
A.  I think I had my wallet in my back pocket, yes.
Q.  If you had your wallet, do you know if you had any identification in there that would identify you as a police officer?
A.  I don't remember.  I don't remember what was in my wallet that day.
Q.  Did you -- did you ever come to learn what Joel was looking for?
A.  No, I -- I don't know.  I assume that he was looking for money, but I don't know if anything was stolen because I never got a chance.  I was arrested immediately, taken out of my house, and then when I came back home, got out of jail, there was tons of things missing from my house, and I didn't know if it was from the police or just from Joel.  I still don't know to this day.
Q.  Okay.  All right.  So he -- Joel has now thrown stuff at you, you've asked him, you know, are you going to steal from me, what happens next?

75

A.  That's when he's yelling at me and throwing all of the stuff from his pockets onto my bed.  And I'm sitting there looking at him trying to figure out what's going on because it was really strange, really confusing to me because only a couple hours ago we were all friends having a good time, a normal time, and now he's super hostile and irate, and I'm trying to figure out why.  And I couldn't figure it out, but all I knew is you need to get out of my house.  And that's what I said to him, I said, "You need to leave right now."
Q.  So he's a completely different person than before you --
A.  100 percent different person.
Q.  And that's unnerving to you?
A.  It was strange.
Q.  And in that moment, you realized maybe I don't know this guy as well as I thought?
A.  That's fair, yes.
Q.  And you decide you are going to have him leave your house?
A.  Right.
Q.  So what did you do to try to get him out of your house?

76

A.  Well, first I told him while I was in bed, I said, "You need to leave my house right now."  And I stood up and I got out of bed, and we both walked down the stairs together.  I think he walked down first, I walked down behind him, and we got downstairs to my living room, and he was walking towards the kitchen, which is the door that we use to leave the house.  I thought he was going to leave and everything was going to be okay, but he stopped and turned me around and, like, faced me in an aggressive manner, like squared up on me.
Q.  Now, at that point in time, did you tell him you really don't want to do this, you know I'm a police officer, or, like, what are you doing?  Anything like that?
A.  I didn't say that.  I just kept telling him to get out, just leave, get out of my house.  And I was pointing towards the door, "Get out of my house."  That's probably all I really said to him was, "Get out of my house."
Q.  Okay.  And then at some point, others join you?
A.  So when we're downstairs, we walked down to the living room, that's when he turned around and, like, squared up -- kind of squared up on me.

19 (Pages 73 to 76)

SA-004

77

Andy was sleeping on the couch right there. And Joel was, like, yelling and pacing back and forth, like fast pacing, and he was pacing, like, past Andy, who was sleeping on the couch. And Joel shook Andy to wake him up, and Andy stood up as confused as I was to what's going on.

Andy just -- he got up, and he just sat -- like stood there with a confused look on his face, and I just kept telling Joel, "Get out."

Q. And Joel is not a small person either; correct?

A. No, he's bigger than me.

Q. All right. If you had to guess height-wise, do you recall?

A. I said he -- he was about my height. I'm 6'3", so he was around my height.

Q. And weight-wise, do you recall?

A. I saw on the autopsy he was 270 pounds.

Q. And was he muscular or more fat and obese?

A. Well, they called him obese in the autopsy. I didn't really see him that way. I know he was a big guy. I didn't really look at him that closely to call him obese, but I knew he was a big guy.

78

Q. And you also knew then that he had worked in private security, so presumably had at least some training; correct?

A. Possibly.

Q. All right. Did you perceive him to be a physical threat?

A. Of course, yes.

Q. Okay. And he's now squared off with you, he's now woken up your friend, what happens next?

A. He woke up Andy off the couch. Andy was standing there. At some point Christopher comes upstairs. I believe he was downstairs in the basement, and he -- he came up. I think he probably heard us yelling because I was yelling at Joel to get out. Joel was yelling back at me that he didn't do anything, and he was just saying eff you and I'm not leaving. Things like that.

So Christopher comes up. And at some point I told Christopher -- because Christopher came upstairs with a confused look on his face, and I went like this towards Joel, and I said to Christopher that he was stealing from me. Yeah.

Q. Then what happens?

79

A. That's when Joel began to get physical. He lunged at me and struck me in my chest, neck area. It was either a punch or a push. I don't know. A little bit of both. I don't know. But he lunged at me like that and hit me here, and I took a step back. I didn't fight him back, I didn't throw a punch -- or a punch back. I was kind of in shock as to is this actually happening right now, I can't believe somebody would do this.

Q. Were you injured?

A. I don't think so, no.

Q. All right. But when you said you took a step back, was it because of the force that he pushed you back or that you just took back to create some distance?

A. Because he pushed me back.

Q. Okay. And then what happens?

A. Shortly after that, he, Joel, punched Christopher in the face.

Q. What prompted that? Do you know?

A. Nothing. As far as I could tell, it was absolutely nothing. It was totally unprovoked.

Q. Had something been said maybe or --

A. Not that I know of, no. It was -- I -- the way

80

I remember it, Christopher didn't say a word. It was 100 percent unprovoked. Joel just swung, punched him right in the face. And it was a bad -- it was a good -- I don't know how you want to say it. It was a bad punch.

Q. So you knew it connected?

A. Oh, yeah. I felt -- or I heard it crack and I saw Christopher go back. And Joel threw the punch so hard that he knocked himself off his own feet when he threw the punch and he fell over. And I had a tall lamp that was right next to Joel, when he threw the punch, he knocked the lamp over and the glass shattered. It was ridiculous. It was all in a tight little spot in my small house, too.

Q. So this has now gone from somebody you want to leave your house to now you witnessing, what, a misdemeanor assault in your presence. Is that fair?

A. He assaulted me and Christopher, yes.

Q. Okay. What happens next?

A. After Joel fell onto the ground, I got on top of him and I used my bodyweight to keep him on the ground because I knew that as soon as he got back up, he was going to continue throwing

20 (Pages 77 to 80)

**81**

punches. It was my goal to not let that happen.

**Q. Now, at this point you've seen this assault,** it's not -- would you agree with me you didn't witness something that you would consider to be a felony level assault at this point?

A. I would say so, yes.

**Q. You would say so what?**

A. If you want to talk about crimes, what was going through my head at the time was that Joel had just tried to steal from me. I don't know if he did try to -- I don't know if he did steal anything or if he just attempted to steal anything. But he did that, and then he refused to leave my house, and then he started physically assaulting people. So in my head, I was thinking of the crime of robbery with use of force, which is a felony. Also, could be interpreted of theft from person, which is a felony, upstairs in my room.

He damaged property in my -- in my house. There's different crimes that you could say he committed and I think he committed.

**Q. Okay. So potential felonies that you've now** witnessed. With respect to the physical

**82**

threat, though, he had not presented as a deadly threat to anyone yet; correct?

MS. BAYNARD: Objection to the form of the question.

Go ahead.

BY MR. JACOB:

**Q. Or at any time; correct?**

MS. BAYNARD: Same objection.

THE WITNESS: I don't know about that, but he -- I don't know how to answer that question. He was -- he was a threat. He was a big guy and he was throwing punches in a tight little spot in my dark house. It was a threat.

BY MR. JACOB:

**Q. Oh, I'm not disputing whether it was a threat** or not. I'm asking, did this threat rise to the he's trying to kill somebody?

MS. BAYNARD: I'm sorry, calls for speculation.

Your perception.

BY MR. JACOB:

**Q. Correct. I don't want to you speculate. I'm** asking for your perception. Did this threat rise to the level where you concluded Joel is trying to commit an unlawful homicide in this

**83**

moment?

A. Well, like I said before, he was a big guy throwing punches in a small tight spot in my house. I know from experience that punching somebody in the face can be deadly. That's possible.

**Q. So if you had your gun with you, would it have** been lawful for you to use deadly force as a police officer if you were performing as a police officer in full uniform at that moment?

A. That would be -- I don't know how to answer that. I -- that's not what happened. I did have my gun in the house, it was in another room, and never during this incident did I even think about going to get it. Didn't cross my mind.

**Q. If it was on you, did you feel threatened to** the point you would have shot him that moment?

A. If I had my gun on me, it would be a different story, it would have been different circumstances. I -- you know, different things could have happened. I could have pointed it at him and told him to get out of my house.

**Q. Not my question.**

A. Lots of things could happen.

**84**

**Q. I appreciate that. My question, though, is** he's now gone to the ground after throwing a punch after pushing you. If you had your gun on him, would you have shot him?

A. At that point while he was on the ground, no.

**Q. Okay. And that's because you didn't perceive** this as an immediate deadly threat to you; correct?

A. Immediately deadly threat? I don't know what his exact intentions were.

**Q. I didn't ask that. I'm asking your perception.**

A. I really don't know how to answer your question.

**Q. Well, you know, down the road we are going to** be in front of a jury and I'm going to ask you the same thing, so I am trying to find out now what your answer is going to be. When I say would you have shot him, you told me no. I'm just asking, well, why wouldn't you have shot him?

A. In that very second while he was on the ground when he knocked himself over, that's what we were speaking about, and no, I wouldn't have shot him when he was down. I wouldn't have --

**Q. And that's because?**

21 (Pages 81 to 84)

85

A. I would have done what I did. I would have used my bodyweight to just hold him down until the police could get there. And that's what I probably would have tried to do.

Q. Would you have tried to take his life in that moment? Was it that type of danger you felt you were facing?

A. I -- well, I never tried to take his life and I -- I didn't feel -- no. I didn't feel in that type of danger that I would need to take his life, no.

Q. As then being a police officer, I'm allowed to ask a little bit of legal as far as how it pertains to your job and how you've been trained. So my question to you then is as a police officer in that moment if you were on duty, would you have been allowed lawfully to shoot him when he was on the ground in that moment?

MS. BAYNARD: I'm going to object to the form of the question.

Go ahead.

THE WITNESS: Would I -- I mean, using deadly force is a very fluid situation. One person might say you are allowed, another

86

person would say you are not allowed.

BY MR. JACOB:

Q. I'm not asking that. I'm asking you would it have been your belief that using deadly force would have been lawful in that moment when he was on the ground?

A. No.

Q. Now, you, though, go to him; correct?

A. I -- when he fell over, I got on top of him, because like I said, I didn't want him to get up and keep punching people.

Q. Okay. And then what happens?

A. We wrestled around a little bit on the ground. He was trying to stand up and I was trying to keep him down on the ground. And he stopped struggling with me for a second, so I stood up over him and I got my phone out and I called 911.

Q. All right. And what happens then?

A. I told the dispatcher I need help at my house. And shortly after that, Joel started to -- he tried to get back up again, and I tried to keep him back down on the ground.

Q. Am I correct, though, during the 911 call, you said I am a police officer and I need help?

87

A. I think -- yes. My words I think I said, "I'm an off-duty police officer and I need help at my house." That is what I said.

Q. And you admitted during cross-examination at your criminal trial you were attempting an arrest. You don't -- you didn't testify falsely at your criminal trial; correct?

A. No. I believe I said that to the police officers afterwards.

Q. Okay. So you're attempting at this point to arrest him because now he has done the various crimes that you had observed; correct?

A. Well, I mean, that's kind of a gray area. It -- I wanted him -- I wanted him arrested for sure --

Q. No, I understand.

A. -- because of the crimes that he did commit. I was off duty in my house. I didn't have -- like I'm not the police officer who can handcuff him and book him into the -- you know, because I was off.

Q. I understand that. But my question is when you testified at your criminal trial under oath and you are cross-examined by the prosecutor and asked if you were performing an arrest and you

88

said you were, were you telling them the truth when you testified?

A. Is that the words that I said? I'm not sure --

Q. You were asked --

A. -- that's correct.

Q. -- were you making an arrest and you said well, yeah.

A. I think I said, "In a way I was."

Q. Yeah.

A. I think those were my --

Q. Right.

A. -- exact words at the trial.

Q. Yeah. So you admitted it; correct?

A. I said -- I said "in a way" because I wanted -- I detained him until the police got there.

Q. Right. So you had gotten up, everything was calm, and when he said and can be heard saying, "Let me go. I want to go home," you don't let him go home, though, at that point; correct?

MS. BAYNARD: Objection to the form of the question, and assumes facts not in evidence, so --

BY MR. JACOB:

Q. Is that correct?

A. Say it again.

22 (Pages 85 to 88)

89

Q. Yeah. What --
MS. BAYNARD: And -- sorry. And compound. That was my form.
BY MR. JACOB:
Q. Sorry. Yes. Then when he is saying "I want to go home" and you can hear him in the call say "I want to go home," you don't let him?
A. Well, I heard him say that on the tape. I didn't hear that in person in the heat of the moment. I didn't hear that.
Q. But you weren't letting him go. He was trying to get -- squirm away at some point. You don't let him go; correct?
A. No, I did not.
Q. All right. Whereas earlier when you were saying, "Get out of my house," you would have let him go?
A. Right. I would have, but that was before he became physical with us.
Q. All right. And before it had turned from I'm defending myself and others to I'm also arresting you now; correct?
A. I mean, I detained him until the police got there. That's what I did.
Q. Right. And you told the prosecutor you agreed

90

that it was in the performance of an arrest; correct?
A. I said, "In a way." Yes, that's what I said.
Q. Well, you didn't say no; correct?
A. Right, I did not say no.
Q. And after the incident when you were asked, you explained you were arresting him for his conduct; correct?
A. I did say that, yes.
Q. And you weren't obstructing justice and lying to law enforcement when you were saying those things after the incident; correct?
A. No.
MS. BAYNARD: Objection to form.
THE WITNESS: Sorry.
MS. BAYNARD: Go ahead. He already answered.
BY MR. JACOB:
Q. You weren't obstructing justice, you were being truthful at that time; correct?
A. I was truthful through this entire process.
Q. Okay. Now, as a police officer, am I correct you are allowed to -- you have a privilege under the law to use force that is objectively reasonable to affect arrest; correct?

91

A. That sounds right.
Q. And you did use some level of force with Joel in affecting this arrest; correct?
A. Yes.
Q. The end result was Joel suffers life-threatening injuries and eventually dies; correct?
A. You are asking me if the end result -- his death was the end result of my force?
Q. Yes.
A. I don't know that.
Q. Would you at least agree your force is part of the events that resulted in a life-threatening injury to him?
MS. BAYNARD: Objection to the form of the question.
You can answer.
THE WITNESS: I don't see it that way, no.
BY MR. JACOB:
Q. All right. Let me ask it this way. When he's standing punching somebody, you don't see him as -- as a medical emergency where he's dying in that moment; correct?
A. Correct.

92

Q. But when he's on the floor after you get off and they are doing CPR, would you agree with me that it appears that he's suffering from some sort of medical emergency, which could be deadly?
A. I would agree with you when I saw it on the body camera.
Q. Okay. So in between those two events, him punching and CPR performing, is anyone else using any force on him other than, I think it was, the friend who was holding his legs?
A. No.
Q. So the only force that's being used at that time other than the legs is by you; correct?
A. Correct.
Q. Hang on one second here. Bear with me here. I've got to navigate to something on here. The force that you were using on Joel, the technique for restraining him, where did you learn that?
A. I -- all I basically did was use my bodyweight to keep him on the ground.
Q. Okay. Where did you learn that?
A. Basically from experience on the police force. A lot of people try to run away from me and I

23 (Pages 89 to 92)

93

was always able to just use my bodyweight to keep the person on the ground until I could get him in handcuffs.

Q. It's not the first time that you used your bodyweight on somebody who is on their stomach to restrain them; correct?

A. No.

Q. No, it's not correct or no, it's not the first time?

A. No, it's not the first time.

Q. All right. This was something that you have done on duty in front of other police officers; correct?

A. Yes.

Q. Nobody has told you during any of those scenes, hey, don't do that, that's dangerous; correct?

A. Correct.

Q. Nobody has said, hey, that's excessive force, you need to not do that; correct?

A. Correct, nobody has said anything like that.

Q. And at times, has this occurred even in front of supervisors of the police department?

A. Yes.

Q. And those supervises never said, hey, don't do that; correct?

94

A. Correct.

Q. And had you been told by a supervisor, hey, don't do that, that can hurt somebody, that's excessive, would you have tried to conform your future conduct to the instruction?

A. Yes.

Q. And in this situation, you are merely doing what you had been doing when you are on duty as far as restraining somebody; correct?

A. To an extent, yes.

Q. During the investigation, you had commented that you had him under control, he was on his stomach, but you couldn't see his face. Would you agree with that?

A. That sounds fair, yes.

Q. And, also, when you were asked if you heard any noises, you had said that you heard wheezing noises coming from him toward the end. Do you recall that?

A. I don't recall that.

Q. Hang on one second here. I got to find where I put this. I apologize. Nothing is ever where you think it's going to be.

MS. BAYNARD: Do you want to take a break?

95

MR. JACOB: Yeah, let's take a minute.

(Recess.)

BY MR. JACOB:

Q. You recall speaking with David Dalland?

A. I do.

Q. Do you recall saying, "I didn't suffocate the guy. I had my arms around his neck, yes, and I held him there, but I didn't suffocate the guy. I didn't press hard enough"? Do you recall saying that?

A. I do.

Q. All right. And you weren't lying to him at that time; correct?

A. No.

Q. You had no reason to lie; correct?

A. Right.

Q. You knew that this was an investigation and that you are required to tell the truth; right?

A. Right.

Q. And so when your arms are around his neck, can you tell us how they were around his neck?

A. I was -- well, he was laying on his stomach and I was on top of him with my knees on the ground. And just like I said before, my arm

96

was -- now, this was after a tussle, after wrestling him for several minutes or however long, I don't know, we were wrestling for. And we ended in this position where I was on top of his upper back and my right arm was on the ground like across his neck and chin area, and my other hand, my elbow was on the ground next to his head on the left side.

Q. In fact, when I saw on the video when the officer comes in first, you are actually laying down, though, on top of his back and upper head area; correct?

A. I -- I was kind of like straddling him, I guess you could say.

Q. I'm sorry. Yes, you are straddling, but your upper body is laying down on his back, neck and head area; is that correct?

A. That's where I was positioned, yes.

Q. Okay. And so you had the one arm under his chin, neck area; correct? That was your right arm, did you say?

A. Yes.

Q. And then your left -- am I correct at some point, though, you are sort of holding his head?

24 (Pages 93 to 96)

97

A. I don't think I ever held his head. I don't think so.

Q. Okay. Well, even -- I mean, you are trying to prevent him from rising up; right?

A. Right. Which he did several times during the struggle.

Q. So he's pushing up, you are pushing down with your upper body against his back, head and neck area; correct?

A. Correct.

Q. And with the arm underneath his neck, that presumably -- was that what caused the wheezing, do you think?

A. I don't think so, no.

Q. What do you think was causing the wheezing?

A. Well, I just want to say during the incident, I don't really -- well, I don't recall any wheezing. I know I might have said that, but I don't recall it now.

Q. Okay.

A. And I didn't know at the time about all of his health history with his lungs and asthma, and things like that. So that could have caused the wheezing, but I don't know. I didn't know that was a thing at the time. I didn't know

98

that was an issue.

Q. All right. But when you heard this respiratory distress, did you do anything to adjust?

MS. BAYNARD: Sorry. Objection to the form to the question with the phrase "Respiratory distress," misstates -- mischaracterizes his testimony.

Go ahead.

THE WITNESS: Well, yeah, I didn't notice any respiratory distress at any time. If I did, that would have changed the situation.

BY MR. JACOB:

Q. But we know you did because you told the investigator that you heard him wheezing; right?

A. I don't -- well, I don't agree with that.

Q. You don't agree that you told the investigator that you heard wheezing?

A. I don't remember saying that, but if you tell me I did, it is possible. But --

Q. Okay. Now, in fairness, you said, "I wasn't squeezing tight enough where he couldn't breathe." Explain "squeezing" if you only have an arm under his neck.

99

A. Well, I didn't squeeze his neck at all ever.

Q. Well, it says, though, that "I wasn't squeezing tight enough where he couldn't breathe." So were you -- did you mean, like, the pressure with the arm underneath, the pressure of your upper body underneath? Is that what you are referring to?

A. No. Like I said, I never did squeeze his neck, so if I said that, that was poor choice of words.

Q. Okay.

A. But no, I never did squeeze his neck.

Q. But you at least knew, though, that the arm was under the chin and the neck area and your body is on top of him, and at some point the struggle stops; correct?

A. Yes.

Q. And at that point, what did you do to deescalate to back off the level of force that you were using?

A. Well, I tried to deescalate before this even happened. I tried.

Q. I understand.

A. I tried to deescalate by telling him to leave my house, but he didn't. He escalated the

100

force.

Q. I appreciate that. Can we stay on the question now, which was, at that point when he stops moving -- let me ask it differently. Am I correct when he stops moving, you still hold him in that position until the officer gets there?

A. I stayed on top of him until the police got there, yes.

Q. What, if anything, did you change, or did you maintain that same restraint-type technique until the officer got there?

A. I just stayed on top of him with my knees and elbows on the ground so he couldn't get back up.

Q. Okay. And arm still under his chin and the neck area?

A. That's the position we ended up in, yes.

Q. So he stops moving. The arm doesn't get withdrawn; correct? Because it was still there when the officer got there; correct?

A. Well --

Q. Right?

A. That happened, yes.

Q. So the officer gets there, and the arm is still

25 (Pages 97 to 100)

SA-010

101

under his chin and the neck area, and he's not moving anymore; correct?

A. Correct.

Q. And, again, as we saw in the video, your upper body is still laying on his upper back, neck and head area; correct?

A. I was on top of him, yes.

Q. Okay. Is there anything that's not factually correct about what I just said?

A. I don't think so.

Q. All right. And when asked by the officer, though, who arrives, "Is he breathing," you said you didn't know?

A. Right. Because when that officer first walked in, I said, "Handcuff this guy." That was my main concern because I figured he was still a threat.

Q. I see. So --

A. And --

Q. So breathing was not your main concern?

A. I didn't know there was anything wrong with his breathing at all, so my main concern was handcuff him. And then the officer asked me -- he kind of ignored me, my request to handcuff him, and he asked me again -- or he asked me,

102

"Is he breathing?" And I said, "I don't know. Handcuff him." I was blowing off his question saying "handcuff this guy" for a second time because I was concerned that he's still a threat.

Q. And yet he's essentially lifeless, he's not moving at that point; right?

        MS. BAYNARD: Objection to the form of the question, calls for --
        If you know.

BY MR. JACOB:

Q. Of course if you know.

        MS. BAYNARD: Yeah.

BY MR. JACOB:

Q. If you don't know, don't tell me something you don't know. And of course if he's laying there lifeless, tell me that, yes, that's what I observed, he was laying there lifeless.

A. I did not know he was lifeless or not breathing or anything like that. I didn't -- I thought he was fine.

Q. He was not moving at all at that point; correct?

A. I guess not.

Q. And you still -- when the officer tells you to

103

get up a couple times, you take his arms, you put them behind his back and want him handcuffed; correct?

A. Yes.

Q. And, again, though, when asked, "Is he breathing," before you get up, you don't know; correct?

A. I said, "I don't know. Handcuff him," because I didn't think he wasn't breathing, I thought he was fine.

Q. Well, then why did you say, "He's fine. Handcuff him"?

A. Those just weren't the words that came out of my mouth. I don't know.

Q. Why didn't you say "handcuff him," and not even -- you said you were trying to blow off the question or blowing off the question. Why didn't you just say "handcuff him"?

A. Because I already did say that and he didn't listen to me, and I had to -- I had -- I don't know, say it in a way that would convey the correct message to him, I guess.

Q. So as you're there in that position when the officer walks in and he asks you if he's breathing and you say you don't know, you did

104

know?

A. No, I did not know. I didn't know that he was hurt in any way, shape or form.

Q. Okay. So you didn't know if he was breathing, that's why you told the officer you didn't know if he was breathing; correct?

A. No. I --

        MS. BAYNARD: Objection --
        Oh, sorry.
        Objection to the form of the question --

BY MR. JACOB:

Q. Is that correct?

        MS. BAYNARD: -- asked and answered.
        Go ahead.
        THE WITNESS: I thought he was okay, so "okay" would be him breathing. I thought he was breathing.

BY MR. JACOB:

Q. Okay. So you thought he was breathing and you told the officer you didn't know if he was breathing. That's what you are saying?

A. That's right.

Q. Okay. What were you doing while you were holding him once he started to calm down, slow

26 (Pages 101 to 104)

105

down and eventually stop moving? Were you talking to him at all?

A. After he calmed down?

Q. Yes.

A. I don't think -- I don't remember talking to him after that. I was exhausted from struggling so much and I figured he was, too, and I knew the police were going to be there any minute, so I thought everything was okay.

Q. Did you say anything while you were doing it, look, just relax, calm down, the police are coming? Anything that you recall?

A. Before when we were struggling with each other, I know I was -- we were talking to each other then.

Q. Do you remember what -- I know we could hear him saying, "Let me go. I will go home." What was your response to that?

A. I said a bunch of words. I don't remember the exact things that I said, but I know I was cursing and I was angry, you know. But I don't remember the exact words I said to him at that point.

Q. Okay. So he does calm, he does stop moving. How long before the officer gets there does

106

that happen?

A. I don't know exactly. I really couldn't tell you. It's been a long time.

Q. It wasn't at the same moment, though; correct? I mean, it wasn't that the officer walked in and then he stopped moving?

A. It wasn't instant.

Q. So he had stopped moving, and then some time, however much it is, passes, and then the officer comes in; is that correct? That's the order of things?

A. Yes.

Q. And so between the time he stops moving and the officer comes in, what are you doing to assess him medically to see is he breathing, is he okay?

A. Well, one time when he originally stops struggling with me, I did look down and I saw that he was breathing. I saw, like, the rise and fall of his chest, and I thought to myself it was a relief. I said, okay, thank God he's done fighting me. Everything is okay. The police will be here every minute, because I called them, I gave them my address, so everything is okay. I thought everything was

107

okay.

Q. And yet the officer comes in, your upper body is back to laying down on him after apparently getting up and seeing him breathing, and your arm is still under his neck; is that correct?

A. I never got up.

Q. Okay. How did you see him breathing unless you leaned up?

A. I just looked down.

Q. But you're laying -- your body was laying on him by the time the officer got there. What made you lay back down on him?

A. I was on top of him, but I wasn't laying 100 percent of my bodyweight on him because my arms -- or, I'm sorry, my elbows and my arms and my knees were on the ground, so I was able to just look down and see and feel that he was breathing, and I didn't think it was a concern.

Q. And you said, you know, thank God -- I think you said you were telling yourself thank God he's done fighting, the police are going to be there. So why did you leave your arm under his neck?

A. I didn't think it was a problem because I wasn't -- I was not choking him, I wasn't

108

applying pressure to his neck, so I didn't think it was a problem.

Q. Okay. Am I correct, though, all you can say is your arm was under his neck. You can't say whether that was cutting off his airway or cutting off his blood flow. Is that fair?

A. I don't think it was. I don't believe it was.

Q. No, I understand. But as you sit here, can you say with certainty, no, I wasn't cutting off his airway at any point when my arm was under his chin?

A. I think I can say that, yes.

Q. Can you say with certainty I did not cut off his blood flow at all or restrict his blood flow at all while my arm was where it was placed at any time?

A. With my arm? Is that what your question was?

Q. Based on how you are holding him, arm under the chin, body laying down on him, can you say that that technique did not restrict or stop his air at any point in time?

A. I can say that, yes.

Q. You can say with certainty?

A. Yes.

Q. And same question with respect to blood flow.

27 (Pages 105 to 108)

121

A.  For example, the eff me so effing -- or so bad, that can't be correct because I would never say anything like that. That's a strange thing to say, so I think that's wrong.

Q.  Okay.

A.  This line number 20 of the 911 tape where it says, "Gasping and a sound similar to loud snorting can be heard." I don't really agree with that because I never heard a snorting noise the night -- or the day of or on that tape of all the times I listened to it. I don't really -- I didn't really hear that.

Q.  Okay.

A.  All right. I think I'm done.

Q.  Okay. Now, you've admitted that you are attempting an arrest. On whose behalf would you be attempting that arrest?

A.  I was -- I held Joel down until the police could come and get him on behalf of everybody, on behalf of me, on behalf of Christopher who got punched in it the face.

Q.  My question is more on are you arresting on behalf of the state, are you arresting on behalf of a local county, are you arresting on behalf of another entity? That's my question.

122

A.  Well, I mean, it really wasn't like that, but it happened in the city of Milwaukee, my house was in the city and county of Milwaukee. I was just -- like I said before, I just detained him until the police could get there.

Q.  I understand that, but we're past that where we already talked about the criminal trial where you admitted where you were making an arrest as well, where you told the investigators you were making that arrest. We are past that. My question is when you are making that arrest, you are doing that on behalf of someone, the king, the state, the federal government. I'm just asking you on behalf of whom?

MS. BAYNARD:  Objection to the form of the question.

Go ahead.

THE WITNESS:  I mean, I didn't see it that way. In the heat of that moment, which was chaotic, I didn't --- I wasn't thinking, okay, I am arresting this man on behalf of the county of Milwaukee.

BY MR. JACOB:

Q.  I didn't ask that question. Can you just -- I appreciate that, but can you answer my

123

question? I have a reason for it. So when you admitted that you are making an arrest, I'm just asking you on whose behalf that arrest is?

MS. BAYNARD:  Just object to asked and answered. I do think he explained to you -- I do think he answered the question. But I think you can answer it again.

MR. MUCHE:  I agree wholeheartedly.

BY MR. JACOB:

Q.  Great.

I don't get it, so help me understand. I'm glad that they heard it and understood it. Maybe you can explain your answer to me. Was it on behalf of the federal government, on behalf of the state government, on behalf of some other government?

MS. BAYNARD:  Same objection.

Go ahead.

THE WITNESS:  I mean, I don't see it that way. Even when I was an on-duty police officer arresting somebody, I never -- that's not something you think about.

BY MR. JACOB:

Q.  So you don't know as a police officer on behalf of whom your authority comes from when you are

124

making an arrest?

A.  No, I didn't say that.

Q.  Well, I'm asking you, when you are making an arrest, are you making it on behalf of the federal government, the state government, your counsel?

A.  Well, I suppose it would depend on the circumstances of the arrest. That's -- I don't know.

Q.  So you were making an arrest. Would it have been for a federal crime?

A.  I don't think so, but --

Q.  Would it have been for a state crime?

A.  Possibly, yes.

Q.  Would it have been for a local ordinance?

A.  Possibly, yes.

Q.  Okay. And when you are functioning as a police officer, performing your law enforcement duties as a police officer, are you doing it on behalf of, let's say, your neighbor said, hey, you are going to be a police officer today, or are you doing it on behalf of a police department that says, hey, we are going to swear you in as a police officer, we are going to ask you to perform as a police officer on our behalf?

31 (Pages 121 to 124)

125

A. The second part, on behalf of the police department whatever.

Q. And which police department was that?

A. Well, the only police department I've ever worked for was Milwaukee.

Q. Okay. And were you acting pursuant to -- or when you are a police officer, are you acting pursuant to your neighbor's book of rules, or does your police department give you a set of policies that you are acting pursuant to?

A. The police department.

Q. Or I should say attempting to act pursuant to because I understand there was some question as to whether you knew what was in certain policies. Is that fair?

A. That's fair.

Q. All right. And with respect to training, you went to the police academy, but that police academy was put on the by the city; correct?

A. Right.

Q. So is it fair to say -- you also said that that was the only law enforcement training you had. When you were acting as a police officer, were you attempting to apply the training that you received from the city then?

126

A. Can you say that again, please?

Q. When you were acting in the capacity as a police officer, were you attempting to conduct yourself in accordance with the training provided by the city?

A. When I was a police officer?

Q. Yeah.

A. Like in general?

Q. Is there another time? I'm not trying to be smart, but --

A. Well, it kind of seems like you are talking about the night of this incident.

Q. Well, was there a different -- on the night of the incident, was there some other training that you were trying to adhere to, or were you trying to always perform when you performed as a police officer in accordance with the training provided by the city?

A. You are getting me tricked up with all of these questions here. I don't know how to correctly respond.

Q. All right. Well, let's ask it this way. When you perform an arrest as a police officer, okay --

A. Okay.

127

Q. -- are you always trying to conform your conduct in accordance with your training?

A. I suppose that's fair.

Q. You were eventually internally investigated related to this incident through IAD. Is that fair?

A. I was.

Q. And if I recall, the violations that were alleged was integrity. And basically a core value of integrity and, again, a -- basically saying you violated the law. Is that fair?

A. I think so. I don't remember exactly what they alleged me to have done. I don't know.

Q. Were you ever investigated specifically for using a neck restraint?

A. By MPD?

Q. Yes.

A. I don't know exactly what they did investigate me for.

Q. Okay.

A. They investigated me for this incident, but I don't know, like, what specifically what, you know --

Q. Did you ever receive -- or do you recall receiving a document saying IAD is

128

investigating you because you were intoxicated when you performed an arrest?

A. I don't remember that, no.

Q. Did IAD ever provide you or did MPD ever provide you with a document that said you are being investigated by IAD because you used non-sanctioned techniques during an arrest?

A. Not that I remember.

Q. At some point, are you aware that a Dr. Brian Peterson, a chief medical examiner, had performed an autopsy on Joel?

A. Yes.

Q. And are you aware that the cause of death was determined to be "anoxic encephalopathy" --
        I will give you the spelling later.
        -- "due to traumatic asphyxia"?

A. That sounds right. I believe that's what it said in the complaint here.

Q. And do you agree that the manner of death was determined to be homicide?

A. That's what it says in the complaint, yes.

Q. And is it your contention that the medical examiner's cause of death is not correct?
        MS. BAYNARD: Hold on a second. Objection, calls for a medical -- medical

Cream City Reporting, LLC
414.585.8128

SA-014

141

A.  Okay.

Q.  Maybe just go in reverse order.  There's just a couple points I want to pick up that came over the course of this morning, but I'm not going to belabor this any more than necessary.

A.  Okay.

Q.  I think the last sort of thing that you were discussing with Attorney Jacob was your letter of resignation.  And that obviously took place chronologically before the criminal trial; right?

A.  Right.

Q.  So at the point that you were acquitted by the criminal jury, you had already resigned from that?

A.  Right.

Q.  You didn't -- you didn't approach the police department in any way seeking reinstatement at that point, did you?

A.  No.

Q.  Okay.  At the point that you invited Mr. Acevedo to your house on April 18th of 2020, fair to say you knew his first and last name?

A.  Yes.

142

Q.  Had you ever -- I believe we talked previously, Mr. Acevedo had met you at your house before a St. Patrick's Day pub crawl event at some point prior to this; right?

A.  Yes.

Q.  Had you ever been to Mr. Acevedo's house?

A.  No.

Q.  Were you aware where he lived?

A.  I just knew he lived in Milwaukee somewhere was my understanding.

Q.  Okay.  Fair enough.  There was some discussion previously about -- about some attempts to transcribe the 911 call; right?

A.  Right.

Q.  Do you also remember during the course of your criminal trial when the district attorney played the 911 recording and asked you questions about it?

A.  Yes.

Q.  And in the course of that testimony, I think there were specific questions identifying certain statements that were captured in that recording and you identified yourself as the speaker.  Do you remember that?

A.  That sounds right.

143

Q.  As you sit here today, is it your testimony that to the extent that you identified yourself as the speaker at the criminal trial that that was truthful and accurate?

A.  As -- I identified myself on that tape, yes.  There was other people's voices on that tape, but I -- I'm sure I identified myself during the trial.  I know I made the call and I was the first -- I believe I was the first person to talk on that tape, I think, so that sounds right.

Q.  Okay.  And just one more clarification to make sure that we're connecting with one another, right.  I agree with you that there are other voices on the call.  To the extent that you testified at your trial this particular voice, that was me -- that this was me that time, you would agree with all of that now?

A.  I don't remember my exact testimony to what question was asked.  I don't remember exactly, but I know I did testify about that tape, and they did play the tape in the trial.  I just don't remember exactly what I said or what was asked of me.

Q.  Do you want to review the transcript of those

144

proceedings to refresh your recollection?

A.  If it will help.

Q.  Okay.  Well, it's fair to say your memory is exhausted at this point; right?

A.  Well, I don't remember everything.  It was five years ago and I would love to put this behind me.

Q.  I can appreciate that.  Okay.  So why don't we mark this as Exhibit 17.  And then once it's marked, Mr. Mattioli, I will just ask you to look at pages 72 and 73.

(Exhibit No. 17 was marked.)

THE WITNESS:  72 and 73?

BY MR. JACOB:

Q.  Yeah.  And there's actually some highlighted portions on that page.  I wasn't necessarily anticipating offering this as an exhibit, but you can actually limit your focus to the highlighted portions of 72 and 73, I think.

A.  Okay.

Q.  And when you've had a chance to read that, just let me know.

A.  Okay.

Q.  Having reviewed your prior testimony, is your memory as to the specific statements to the 911

36 (Pages 141 to 144)

165

drugs on the night of or into the early morning of April 19th of 2020?

A. No, I didn't know it that day.

Q. And you were asked whether or not you would have had the ability to use deadly force. Do you -- do you recall that question?

MR. JACOB: Objection.

BY MS. BAYNARD:

Q. You can answer.

A. Yes, I was asked that question.

MR. JACOB: No.

BY MS. BAYNARD:

Q. Even if --

You didn't ask him that?

MR. JACOB: No, I --

MS. BAYNARD: If he would have been permitted to?

MR. JACOB: If it would have been lawful as a police officer in that circumstance.

BY MS. BAYNARD:

Q. Okay. So even if you would have been permitted to use deadly force against Mr. Acevedo, and by "Deadly force," I mean, your firearm against Mr. Acevedo, would you have?

166

A. I don't think so because it was never my intention to hurt him and it definitely wasn't my intention to kill him. I just wanted to hold him there until the police could get there.

Q. You held him there because you wanted to prevent him from becoming assaulted again?

A. Correct.

Q. And assaulting you?

A. Correct.

Q. And assaulting Mr. Peters?

A. Yes.

Q. The plaintiffs -- I'm going to represent to you that the plaintiffs -- you are aware that the plaintiffs filed a complaint against you, a civil complaint?

A. Right.

Q. We are here for a civil action that's separate from the criminal action?

A. Correct.

Q. Okay. If I represent to you that the plaintiffs allege that you applied a chokehold neck restraint to Acevedo for approximately 11 minutes and 27 seconds, would you disagree with that?

167

A. Yes.

MS. BAYNARD: I don't have anything else.

EXAMINATION

BY MR. JACOB:

Q. Just two questions. Number one, when you are on duty in full uniform and you arrest someone, do you always say "you are under arrest"?

A. No.

Q. And can you tell us how to perform a rear naked chokehold?

A. Not really, no.

MR. JACOB: Okay. No further questions.

MR. MUCHE: I have nothing else.

(Proceedings concluded at 1:33 p.m.)

168

STATE OF WISCONSIN )
) SS:
COUNTY OF MILWAUKEE )

I, ALICIA PABICH, a Certified Shorthand Reporter and Notary Public in and for the State of Wisconsin, do hereby certify that the above deposition of MICHAEL MATTIOLI was recorded by me on April 25, 2025, and reduced to writing under my personal direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof I have hereunder set my hand and affixed my seal of office at Milwaukee, Wisconsin, this 1st day of May, 2025.

Notary Public
In and for the State of Wisconsin

Cream City Reporting, LLC
414.585.8128

SA-016

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

_____

JOSE ACEVEDO, Individually, and as Special
Administrator of the ESTATE OF JOEL ACEVEDO;

          Plaintiff,

v.                                       CASE NO. 23cv00489

OFFICER MICHAEL MATTIOLI,
OFFICER ROBERT ROACH, and
ALFONSO MORALES,

          Defendants.

_____

**DEFENDANT, MICHAEL MATTIOLI'S RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSION, INTERROGATORIES, AND
REQUESTS FOR PRODUCTION**

_____

Defendant, Michael Mattioli, by his attorneys, WIRTH + BAYNARD, hereby responds to

plaintiff, Jose Acevedo's First Set of Requests for Admission, Interrogatories, and Requests for

Production as follows:

**REQUESTS FOR ADMISSION OF FACT**

1.     Please admit that on April 19, 2020, at the time of the incident involving Joel Acevedo, MICHAEL MATTIOLI and ROBERT ROACH were employed by the City of Milwaukee Police Department as sworn police officers.

     **RESPONSE: Admit.**

2.     Please admit that on April 19, 2020, at the time of the incident involving Joel Acevedo, ALFONSO MORALES was employed by the City of Milwaukee Police Department as a sworn police officer with the rank of Chief of Police.

     **RESPONSE: Admit.**

3.     Please admit that on April 19, 2020, MICHAEL MATTIOLI called 911 and requested police assistance at his residence.

**RESPONSE: Admit.**

4.     Please admit that during the 911 call, MICHAEL MATTIOLI identified himself as a police officer.

**RESPONSE: Admit.**

5.     Please admit that MICHAEL MATTIOLI was wearing a black Officer Matthew Rittner Memorial shirt with MPD badge insignia during the incident.

**RESPONSE: Admit.**

6.     Please admit that at the time of the incident, MICHAEL MATTIOLI believed that Joel Acevedo had committed a crime, including but not limited to theft and assault.

**RESPONSE: Admit.**

7.     Please admit that prior to MICHAEL MATTIOLI'S use of force against Joel Acevedo, Acevedo did not present as a serious or deadly threat to anyone.

**RESPONSE: Deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense. As to the remaining allegations, Deny.**

8.     Please admit that prior to MICHAEL MATTIOLI'S use of force against Joel Acevedo, MATTIOLI did not have any reason to believe that Acevedo was armed with a weapon.

**RESPONSE: Deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense. As to the remaining allegations, Deny.**

9.     Please admit that MICHAEL MATTIOLI used force against Joel Acevedo in an attempt to place him under arrest.

**RESPONSE: Objection. This request seeks a legal conclusion and further relies on the undefined term "arrest." Subject to and without waiving the objection, deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense. As to the remaining allegations, admit**

2

SA-018

**only that Defendant Mattioli temporarily restrained Acevedo until police officers arrived,**

**but deny that Defendant Mattioli intended to make an "arrest" subject to the parameters of**

**the Fourth Amendment.**

10.     Please admit that upon the arrival of the responding police officers (which included ROBERT ROACH), MICHAEL MATTIOLI was physically restraining Joel Acevedo inside of MATTIOLI'S home.

**RESPONSE: Admit.**

11.     Please admit that during the incident, MICHAEL MATTIOLI identified himself as a police officer to ROBERT ROACH and other police officers.

**RESPONSE: Admit only that when asked by Officer Roach whether he was a**

**Milwaukee police officer, Defendant Mattioli responded in the affirmative.**

12.     Please admit that during the incident, MICHAEL MATTIOLI applied his body weight to Joel Acevedo's back while Acevedo was in a prone position.

**RESPONSE: Admit.**

13.     Please admit that during the incident, MICHAEL MATTIOLI applied a chokehold to Joel Acevedo.

**RESPONSE: Deny.**

14.     Please admit that during the incident, MICHAEL MATTIOLI applied the chokehold to Joel Acevedo for approximately 11 minutes and 20 seconds.

**RESPONSE:  Deny.**

15.     Please admit that during the incident, MICHAEL MATTIOLI applied a neck restraint to Joel Acevedo.

**RESPONSE: Deny.**

16.     Please admit that during the incident, MICHAEL MATTIOLI applied the neck restraint to Joel Acevedo for approximately 11 minutes and 20 seconds.

**RESPONSE: Deny.**

17.     Please admit that during the incident, the force used by MICHAEL MATTIOLI  against Joel Acevedo restricted Acevedo's ability to breathe.

**RESPONSE: Deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense. As to the remaining allegations, Defendant Mattioli lacks knowledge or information sufficient to determine the truth or falsity of the request because the request seeks a medical opinion and calls for speculation, therefore deny.**

18.     Please admit that during the incident, the force used by MICHAEL MATTIOLI  against Joel Acevedo restricted blood flow to his brain.

**RESPONSE: Deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense. As to the remaining allegations, Defendant Mattioli lacks knowledge or information sufficient to determine the truth or falsity of the request because the request seeks a medical opinion and calls for speculation, therefore deny**

19.     Please admit that during the incident, MICHAEL MATTIOLI knew that Andrew Jankowski was restraining Joel Acevedo's legs.

**RESPONSE: Deny.**

20.     Please admit that during the incident, MICHAEL MATTIOLI did not instruct Andrew Jankowski to stop restraining Joel Acevedo's legs.

**RESPONSE: Admit.**

21.     Please admit that when asked by ROBERT ROACH, MICHAEL MATTIOLI stated that he was uncertain if Joel Acevedo was breathing.

**RESPONSE: Admit only that as Officer Roach approached, Defendant Mattioli asked him to handcuff Acevedo – a request he would not have made if he had known Acevedo was not breathing, and that Defendant Mattioli was concerned that by replying with a question about whether Acevedo was breathing, Roach had either not heard Defendant Mattioli's request to handcuff Acevedo or he was deflecting/skipping that request, and Defendant Mattioli therefore attempted to redirect Roach's**

focus to his request that Acevedo be handcuffed by replying, "I don't know, handcuff him."

22.     Please admit that ROBERT ROACH waited approximately 22 seconds before intervening and ordering MICHAEL MATTIOLI to end the use of force against Joel Acevedo.

**RESPONSE: Deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense. As to the remaining allegations, admit that body camera shows approximately 22-seconds between the time Officer Roach entered the home and Defendant Mattioli disengaged from Acevedo.**

23.     Please admit that prior to the incident, ROBERT ROACH knew that when the human brain does not get sufficient oxygen, brain cells begin to die within five minutes.

**RESPONSE: Objection, this Request calls for improper speculation. Without waiving that objection, Defendant Mattioli responds that he lacks information or knowledge sufficient to determine the truth or falsity of the request about what was in the mind of Defendant Roach and what Defendant Roach may have known, and therefore deny.**

24.     Please admit that prior to the incident, MICHAEL MATTIOLI knew that when the human brain does not get sufficient oxygen, brain cells begin to die within five minutes.

**RESPONSE: Deny.**

25.     Please admit that MICHAEL MATTIOLI removed his arm from around Joel Acevedo's neck only after being instructed to do so by ROBERT ROACH.

**RESPONSE: Admit that Defendant Roach directed Defendant Mattioli to get off Acevedo but deny that Defendant Roach ever instructed Defendant Mattioli to remove his arms from around Acevedo's neck.**

26.     Please admit that no weapon was found on Joel Acevedo's person during or after the incident.

**RESPONSE: Admit.**

27.     Please admit that MICHAEL MATTIOLI did not receive injuries during the incident with Joel Acevedo.

**RESPONSE: Deny.**

28.    Please admit that MICHAEL MATTIOLI did not report the suffrage of any injuries during the incident with Joel Acevedo.

**RESPONSE: Deny.**

29.    Please admit that at the time of the incident involving Joel Acevedo, MICHAEL MATTIOLI was acting pursuant to his authority as a sworn police officer employed by the Milwaukee Police Department.

**RESPONSE: Objection. This request seeks a legal determination and is impermissibly vague as to the term "pursuant to his authority…." Subject to and without waiving the objection, admit only that Defendant Mattioli was employed by the Milwaukee Police Department at the time of the incident, but was off-duty, and thus his responsibility and "authority" would be dictated by MPD Standard Operating Procedure 220.30 "off-duty arrests and aid." As to the remaining requests, admit only that Defendant Mattioli intended to act pursuant to his duties under said SOP.**

30.    Please admit that during the incident involving Joel Acevedo, MICHAEL MATTIOLI was acting within the scope of his authority as a sworn police officer employed by the Milwaukee Police Department.

**RESPONSE: Objection. This request seeks a legal determination and is impermissibly vague as to the term "pursuant to his authority…." Subject to and without waiving the objection, admit only that Defendant Mattioli was employed by the Milwaukee Police Department at the time of the incident, but was off-duty, and thus his responsibility and "authority" would be dictated by MPD Standard Operating Procedure 220.30 "off-duty arrests and aid." As to the remaining requests, admit only that Defendant Mattioli intended to act pursuant to his duties under said SOP**

31.    Please admit that at the time of the incident, MICHAEL MATTIOLI had the legal authority to enforce the laws of the State of Wisconsin.

**RESPONSE: RESPONSE: Objection. This request seeks a legal determination and is impermissibly vague as to the term "pursuant to his authority…." Subject to and without waiving the objection, admit only that Defendant Mattioli was employed by the Milwaukee Police Department at the time of the incident, but was off-duty, and thus his responsibility and "authority" would be dictated by MPD Standard Operating Procedure 220.30 "off-duty arrests and aid." As to the remaining requests, admit only that Defendant Mattioli intended to act pursuant to his duties under said SOP.**

32.     Please admit that at the time of the incident involving Joel Acevedo, MICHAEL MATTIOLI had a legal duty to enforce the laws of the State of Wisconsin.

**RESPONSE: Deny.**

33.     Please admit that during the use of force incident, MICHAEL MATTIOLI was acting pursuant to the policies of the Milwaukee Police Department.

**RESPONSE: Objection. This request seeks a legal determination and is impermissibly vague as to the "policies" that are the subject of this request. Subject to and without waiving the objections, deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense; further admit only that Defendant Mattioli was employed by the Milwaukee Police Department at the time of the incident, but was off-duty, and thus his responsibility and "authority" would be dictated by MPD Standard Operating Procedure 220.30 "off-duty arrests and aid." As to the remaining requests, admit only that Defendant Mattioli intended to act pursuant to his duties under said SOP.**

34.     Please admit that during the use of force incident, MICHAEL MATTIOLI was acting pursuant to the training provided by the Milwaukee Police Department.

**RESPONSE: Deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense; as to the**

**remaining allegations, deny.**

35.     Please admit that during the use of force incident, MICHAEL MATTIOLI knew that the law permitted him to only use force that was objectively reasonable.

**RESPONSE: Deny the characterization of Defendant Mattioli's actions as a "use of force" and affirmatively assert that Defendant Mattioli was acting in self-defense. As to the remaining allegations, admit.**

36.     Please admit that Alfonso Morales' failure to issue appropriate discipline and to instead protect officers who engaged in wrongdoing, encouraged a culture of related police misconduct in the Milwaukee Police Department.

**RESPONSE: Deny.**

37.     Please admit that MICHAEL MATTIOLI'S actions during the incident were encouraged by a culture of police misconduct that existed in the Milwaukee Police Department.

**RESPONSE: Deny.**

## INTERROGATORIES

1.     Please provide the following information about each Individual Defendant: full legal name and any aliases; date and city of birth; and current/former cities/towns/states of residence.

**ANSWER:** **Full Legal Name:** **Michael A. Mattioli**
**Aliases:** **N/A**
**Date of Birth:** **▮▮/1987**
**City of Birth:** **▮▮▮▮ WI**
**Current Address:** **Information in care of defense counsel.**
**Prior Addresses:** **▮▮▮▮▮▮▮**
**Milwaukee, WI 53219**

2.     Please provide the following information about each Individual Defendant: present/former employers, dates of employment, date of any employment termination, whether the termination was voluntary or involuntary, and the reason for the termination.

**ANSWER:     Objection. This interrogatory seeks information that is irrelevant to any claim or defense, is not proportional to the needs of the case, and is without a specified timeframe. Subject to said objections and without waiving these objections:**

**Present Employer:          Information in care of defense counsel.**

8

SA-024

| | |
|---|---|
| **Dates of Employment:** | **11-01-22 until present.** |
| **Former Employer:** | **Milwaukee Police Department** |
| **Dates of Employment:** | **08/14/2006 (P.A.) and 03/22/2009 (P.O.) to 09/08/2020** |
| **Termination:** | **Voluntary (Resigned)** |
| **Reason for Termination:** | **Voluntary (Resigned)** |

3.      Please identify (name, address, telephone number, email address) all persons who have, or who are believed to have, knowledge or information related to the allegations and claims stated in the Complaint, or any defense to same, and for each person identified, identify the specific knowledge or information that they are believed to possess.

**ANSWER:      Objection to the extent this Interrogatory requires the responding party to marshal all its available proof or proof the Defendant intends to offer at trial and calls for the disclosure of attorney work product prepared in anticipation of litigation. Subject to and without waiving said objections, *See* Defendant Mattioli's Initial Disclosure Statement. Defendant will supplement this response in accordance with the court's scheduling order and Rule 26.**

4.      Please describe in detail MICHAEL MATTIOLI'S activities during the 48 hours leading up to the incident involving Joel Acevedo, including your interaction with Joel Acevedo prior to the use of force incident.

**ANSWER:      Objection. This Interrogatory seeks information that is irrelevant, immaterial, or inadmissible and is overly broad, vague, and calls for a narrative response better suited for a deposition.  Further object on the basis this Interrogatory is premised on the claim that the altercation between Defendant Mattioli and Acevedo was a "use of force" when it was an act of self-defense. Subject to said objections and without waiving same, on April 18, 2020, Mattioli had friends over at his residence for a bonfire where the participants were drinking, including Acevedo.  At some point, Mattioli had fallen asleep and woke up to Acevedo attempting to rob him and an altercation occurred in which Acevedo battered Mattioli and others present.**

9

5.    Please identify with as much specificity as possible, any policy of the Milwaukee Police Department that governed or should have governed any/all of MICHAEL MATTIOLI and/or ROBERT ROACH'S actions discussed in the Complaint.

**ANSWER:    Objection. This interrogatory seeks information outside of the answering Defendant Mattioli's control. Subject to and without waiving the objection, with respect to Defendant Mattioli, Milwaukee Police Department Standard Operating Procedure 220.**

6.    Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding acting in the capacity as an off-duty police officer.

**ANSWER:    Objection. This Interrogatory is overly broad, unduly burdensome, and seeks disclosure of information not currently within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and maintained by a third party — *i.e.,* Milwaukee Police Department. Without waiving that objection, the only response Defendant Mattioli can provide concerns his own experience, and he does not have an independent recollection of any specific dates, entity sponsor, instruction, number of hours, policy name or number other than those listed in his training records. Subject to and without waiving the objections, *See* Defendant Mattioli's Preparatory Law Enforcement Training Transcript and Milwaukee Police Department Police Academy Training Record that accompanies these responses.**

7.    Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding de-escalation.

**ANSWER:    Objection. This Interrogatory is overly broad, unduly burdensome, and seeks disclosure of information not currently within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and**

10

**SA-026**

maintained by a third party — *i.e.,* **Milwaukee Police Department. Without waiving that objection, the only response Defendant Mattioli can provide concerns his own experience, and he does not have an independent recollection of any specific dates, entity sponsor, instruction, number of hours, policy name or number other than those listed in his training records. Subject to and without waiving the objections,** *See* **Defendant Mattioli's Preparatory Law Enforcement Training Transcript and Milwaukee Police Department Police Academy Training Record that accompanies these responses.**

8.      Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding any duty to intervene.

**ANSWER:      Objection. This Interrogatory is overly broad, unduly burdensome, and seeks disclosure of information not currently within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and maintained by a third party — *i.e.,* Milwaukee Police Department. Without waiving that objection, the only response Defendant Mattioli can provide concerns his own experience, and he does not have an independent recollection of any specific dates, entity sponsor, instruction, number of hours, policy name or number other than those listed in his training records. Subject to and without waiving the objections,** *See* **Defendant Mattioli's Preparatory Law Enforcement Training Transcript and Milwaukee Police Department Police Academy Training Record that accompanies these responses.**

9.      Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding the use of force.

**ANSWER:      Objection. This Interrogatory is overly broad, unduly burdensome, and**

SA-027

seeks disclosure of information not currently within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and maintained by a third party — *i.e.,* Milwaukee Police Department. Without waiving that objection, the only response Defendant Mattioli can provide concerns his own experience, and he does not have an independent recollection of any specific dates, entity sponsor, instruction, number of hours, policy name or number other than those listed in his training records. Subject to and without waiving the objections, *See* Defendant Mattioli's Preparatory Law Enforcement Training Transcript and Milwaukee Police Department Police Academy Training Record that accompanies these responses.

10.     Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding the use of deadly force.

ANSWER:     Objection. This Interrogatory is overly broad, unduly burdensome, and seeks disclosure of information not currently within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and maintained by a third party — *i.e.,* Milwaukee Police Department. Without waiving that objection, the only response Defendant Mattioli can provide concerns his own experience, and he does not have an independent recollection of any specific dates, entity sponsor, instruction, number of hours, policy name or number other than those listed in his training records. Subject to and without waiving the objections, *See* Defendant Mattioli's Preparatory Law Enforcement Training Transcript and Milwaukee Police Department Police Academy Training Record that accompanies these responses.

11.     Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding

12

SA-028

the use of neck restraints.

**ANSWER:    Objection. This Interrogatory is overly broad, unduly burdensome, and seeks disclosure of information not currently within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and maintained by a third party — *i.e.,* Milwaukee Police Department. Without waiving that objection, the only response Defendant Mattioli can provide concerns his own experience, and he does not have an independent recollection of any specific dates, entity sponsor, instruction, number of hours, policy name or number other than those listed in his training records. Subject to and without waiving the objections, *See* Defendant Mattioli's Preparatory Law Enforcement Training Transcript and Milwaukee Police Department Police Academy Training Record that accompanies these responses.**

12.    Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding the use of chokeholds.

**ANSWER:    Objection. This Interrogatory is overly broad, unduly burdensome, and seeks disclosure of information not currently within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and maintained by a third party — *i.e.,* Milwaukee Police Department. Without waiving that objection, the only response Defendant Mattioli can provide concerns his own experience, and he does not have an independent recollection of any specific dates, entity sponsor, instruction, number of hours, policy name or number other than those listed in his training records. Subject to and without waiving the objections, *See* Defendant Mattioli's Preparatory Law Enforcement Training Transcript and Milwaukee Police Department Police Academy Training Record that accompanies these responses.**

13.     Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding first aid and/or CPR.

**ANSWER:     Objection. This Interrogatory is overly broad, unduly burdensome, and seeks disclosure of information not currently within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and maintained by a third party — *i.e.,* Milwaukee Police Department. Without waiving that objection, the only response Defendant Mattioli can provide concerns his own experience, and he does not have an independent recollection of any specific dates, entity sponsor, instruction, number of hours, policy name or number other than those listed in his training records. Subject to and without waiving the objections, *See* Defendant Mattioli's Preparatory Law Enforcement Training Transcript and Milwaukee Police Department Police Academy Training Record that accompanies these responses.**

14.     Please identify with as much specificity as possible (i.e., by class, module, or course name; the date(s) provided, entity sponsor, instructor, number of hours; policy name or number) any policy and/or training provided to MICHAEL MATTIOLI and/or ROBERT ROACH similar to "street survival," "killology," "bulletproof warrior," "warrior spirit," "warrior cop," and/or similar warrior-type training.

**ANSWER:     Defendant Mattioli has no information regarding any such training.**

15.     Please advise if MICHAEL MATTIOLI has ever been diagnosed with a substance abuse issue (alcohol, drugs, and/or prescription medication), or has ever been suspected of suffering from same. If the answer is yes, please identify and explain with as much detail as is possible (i.e., who, what, when, where, and why).

**ANSWER:     Objection. This Interrogatory seeks information that is not relevant to any party's claim or defense and is disproportionate to the needs of the case. Subject to and without waiving the objection, Defendant Mattioli has never been diagnosed with nor suspected of suffering from a substance abuse issue.**

16.     Please identify and explain if MICHAEL MATTIOLI has ever been diagnosed with, and/or was suspected of suffering from, a brain injury, emotional health issue, mental health issue, a psychotic break, delusions, hallucinations, or any other temporary or permanent issue that might impact mood, behavior, or judgment. If the answer is yes, please identify and explain with as much detail as is possible (i.e., who, what, when, where, and why).

**ANSWER:     Objection. This Interrogatory seeks information that is not relevant to any party's claim or defense and is disproportionate to the needs of the case. Subject to and without waiving the objection, Defendant Mattioli has never been diagnosed with nor suspected of suffering from a brain injury, emotional health issue, mental health issue, a psychotic break, delusions, hallucinations, or any other temporary or permanent issue that might impact mood, behavior, or judgment.**

17.     Please identify all documents or categories of documents (electronic, hardcopy, audio, and video), excluding attorney-client communications and attorney work product, containing any information related to the allegations and claims stated in the Complaint, or any defense to same, and the custodians of said documents.

**ANSWER:     Objection to the extent this Request seeks the premature disclosure of possible trial exhibits and attorney work product. Subject to said objection and without waiving same, *See* accompanying documents identified in Michael Mattioli's Initial Disclosure Statement.**

18.     Please identify any reports or statements made by any Individual Defendant to the Milwaukee Police Department or other authorities regarding the incident, including the timing of these reports.

**ANSWER:     Objection. This Interrogatory seeks disclosure of documents and/or information that may not currently be within the possession, custody, or control of defendant Mattioli in that this Interrogatory is seeking information prepared by and maintained by a third party — *i.e.,* Milwaukee Police Department.  Subject to and without waiving the objection, Defendant Mattioli can only answer regarding his own experience, and he is aware of the following reports:**

15

SA-031

**Sunday, 04/19/2020 – Defendant Mattioli made statements to Sgt. Jeffrey Dolkiewicz, and PO Matthew Bouzek who prepared reports based upon those conversations.**

19.    Please identify whether a policy, practice, or custom of the Milwaukee Police Department was the moving force that caused MICHAEL MATTIOLI and/or ROBERT ROACH to engage in any/all of the actions that they personally engaged in during the incident involving Joel Acevedo. If the answer is "yes," please identify the policy by name and/or number.

**ANSWER:    As to Defendant Mattioli, none.**

20.    Please identify with specificity any/all Milwaukee Police Department policies, procedures, or training, violated by MICHAEL MATTIOLI and/or ROBERT ROACH during the incident involving Joel Acevedo.

**ANSWER:    Objection. This Interrogatory asks for a legal conclusion premised upon the unidentified term: "violated." To the extent that this is deemed a factual inquiry, Defendant Mattioli can only respond to his personal experience; and subject to and without waiving the objection, it is Defendant Mattioli's understanding that he did not violate Milwaukee Police Department policies, procedures, or training.**

21.    Please identify with specificity any/all internal, administrative, oversight, civil, and/or criminal investigations related to any of the matters discussed in the Complaint, and explain the scope and status of same, and any disposition/conclusions that resulted from same.

**ANSWER:    Objection. This Interrogatory calls for a narrative response. Subject to and without waiving the objection, Defendant Mattioli is aware that an internal investigation and criminal investigation were conducted as a result of the alleged incident. Upon information and belief, Mattioli resigned, and the internal investigation was never completed.**

22.    Please identify any internal affairs, or similar type investigation, by date, complaint subject matter (i.e., unlawful arrest, use of force, etc.), and incident number, wherein any Individual Defendant was the subject of the investigation.

**ANSWER:    To the best of my knowledge, there was an investigation into a Use of Force Complaint on or about 10/21/2011 and the result of that investigation deemed the inquiry unfounded. There may have been additional complaints noted in my MPD HR file.**

23. Identify all persons with whom any Individual Defendant has communicated by electronic means, i.e., text or email (personal or work), regarding any matter related to the allegations stated in the Complaint, and identify the electronic means used to communicate.

**ANSWER:  Objection. This Request is overly broad, unduly burdensome, and further seeks information that may be protected by the attorney-client privilege, work product doctrine, or to the extent that it seeks the production of information that might disclose the thoughts, impressions, or legal strategies of Defendant's counsel. Subject to and without waiving the objection, Defendant Mattioli may have had communications with the following individual regarding matters discussed in the complaint:**

- **Attorney Michael F. Hart**
- **Attorney Craig S. Powell**
- **Officer David Dalland**
- **Detective Matthew Goldberg**
- **Sgt. Jeffrey Dolkiewicz**
- **Police Officer Matthew Bouzek**

24. Please confirm that the Individual Defendant's and the Milwaukee Police Department's email, text messaging, and dispatch systems have been searched for any documents or information related to or discussing the matters discussed in the Complaint (including but not limited to Email in-box, sent, and deleted mailboxes), and identify each system and explain the search procedure used.

**ANSWER:    Confirm.**

### REQUEST FOR PRODUCTION OF DOCUMENTS

1. Your Initial Disclosures, and all documents identified in any Initial Disclosures, or related to any of the information or documents discussed in each Defendant's responses to the Interrogatories served in this matter.

**RESPONSE:** *See* **accompanying documents.**

2. The application for employment, background investigation, result of any physical or mental health testing or evaluation related to the employment process, training, internal affairs, and disciplinary files for the Individual Defendants.

**RESPONSE: To the extent that this information is contained within Defendant Mattioli's MPD HR file—production will be made subject to redactions and/or a protective**

order.

3.      Any employment contract, employment termination documents, severance documents, lawsuits, arbitrations, and/or settlement agreements, involving any of the Individual Defendants.

**RESPONSE: To the extent that this information is contained within Defendant Mattioli's MPD HR file—production will be made subject to redactions and/or a protective order.**

4.      All documents identifying or discussing the Individual Defendants' job descriptions in April of 2020 for the Milwaukee Police Department.

**RESPONSE: *See* accompanying documents.**

5.      Any document related to any complaint and/or discipline that the Individual Defendants, received during the course of their employment; regardless of subject matter.

**RESPONSE: To the extent that this information is contained within Defendant Mattioli's MPD HR file—production will be made subject to redactions and/or a protective order.**

6.      All documents (electronic or hardcopy), including but not limited to 911 recordings or documents, incident reports, supplemental reports, investigation notes, witness statements, compelled statements, memorandum, transcripts, audio, video, CAD, text messaging, in car messaging, personal or work email, correspondence, communications, messaging, radio communications, and/or social media, referencing, discussing, recording, or memorializing, any matter discussed in the Complaint or related to same.

**RESPONSE: *See* accompanying documents.**

7.      Any written acknowledgments, agreements, or receipts, signed by any Individual Defendant related to Milwaukee Police Department policies and procedures.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents responsive this request.**

8.      Any document identifying and/or detailing any specific policy and/or training that governed or should have governed or guided MICHAEL MATTIOLI and/or ROBERT ROACH'S conduct discussed in the Complaint.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents**

**responsive this request.**

9.      Any document identifying and/or detailing any specific <u>policy</u> and/or <u>training</u> provided to MICHAEL MATTIOLI and/or ROBERT ROACH regarding the following topics:

        a.  Acting in the capacity as an off-duty police officer;
        b.  De-escalation;
        c.  Any duty to intervene;
        d.  The use of force;
        e.  The use of deadly force;
        f.  The use of neck restraints;
        g.  The use of chokeholds;
        h.  First aid and/or CPR; and
        i.  Similar to "street survival," "killology," "bulletproof warrior," "warrior spirit," "warrior cop," and/or similar warrior-type training.

      **RESPONSE: Defendant Michael Mattioli is not in possession of any documents**

**responsive this request.**

10.     Any document identifying and/or detailing any specific <u>policy</u> or <u>procedure</u> that MICHAEL MATTIOLI and/or ROBERT ROACH <u>relied upon</u> or <u>violated</u> with respect to the incident discussed in the Complaint or any related matter.

      **RESPONSE: Defendant Michael Mattioli is not in possession of any documents**

**responsive this request.**

11.     Any document identifying and/or detailing any specific <u>training</u> that MICHAEL MATTIOLI and/or ROBERT ROACH <u>relied upon</u> or <u>violated</u> with respect to the incident discussed in the Complaint or any related matter.

      **RESPONSE: Defendant Michael Mattioli is not in possession of any documents**

**responsive this request.**

12.     All documents or communications related to any civil or criminal proceedings against you, including but not limited to the incident with Joel Acevedo.

      **RESPONSE:  Objection. This Request is overly broad/unduly burdensome and further seeks**

**information that may be protected by the attorney-client privilege, work product doctrine, or to the**

**extent that it seeks the production of information that might disclose the thoughts, impressions, or**

**legal strategies of Defendant's counsel. Subject to and without waiving the objections,** *see*

19

**accompanying documents in the possession of Defendant Mattioli relating to Milwaukee County Case Number 2020CF001991.**

13.     Provide any personal notes, journals, or diaries maintained by MICHAEL MATTIOLI that reference any information related to or resulting from the incident with Joel Acevedo.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents responsive this request.**

14.     Any medical reports, assessments, or evaluations related to any medical care provided to Joel Acevedo or MICHAEL MATTIOLI following the incident involving Joel Acevedo.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents responsive this request.**

15.     All correspondence or documentation pertaining to any counseling, psychological support, or mental health services MICHAEL MATTIOLI sought or were referred to following the incident with Joel Acevedo.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents responsive this request.**

16.     All documents related to any oversight, internal, administrative, employment, civil, and/or criminal investigation of any of the matters discussed in the Complaint or related to same.

**RESPONSE:  See documents produced in response to Request Nos. 1, 6 and 12, above. To the extent that this information is contained within Defendant Mattioli's MPD HR file—production will be made subject to redactions and/or a protective order.**

17.     All documents provided to or received from (via subpoena or otherwise) third parties containing any information regarding the matters discussed in the Complaint or related to same.

**RESPONSE:  Objection. This Request is overly broad/unduly burdensome, is unlimited as to time, scope, relevance to this action or materiality to the claims or defenses alleged, and further seeks information that may be protected by the attorney-client privilege, work product doctrine, or to the extent that it seeks the production of information that might disclose the thoughts, impressions, or**

20

SA-036

**legal strategies of Defendant's counsel. Subject to and without waiving the objections, see accompanying documents for any responsive materials.**

18.     All documents provided to or received from any government official, governmental agency, or any person or entity with oversight responsibility, reporting or discussing the events discussed in the Complaint or any matter related to same.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents responsive this request.**

19.     All documents, including departmental memos or bulletins, related to changes in Milwaukee Police Department policies or procedures related to, influenced by, or resulting from, the incident with Joel Acevedo.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents responsive this request.**

20.     Any documents detailing how off-duty conduct is monitored or reviewed by the Milwaukee Police Department.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents responsive this request.**

21.     Any documents detailing any disciplinary warning systems used by the Milwaukee Police Department to monitor and supervise police officers.

**RESPONSE: Defendant Michael Mattioli is not in possession of any documents responsive this request.**

22.     Any documents detailing how citizen complaints, internal affairs complaints, or similar type complaints or investigations are tracked by the Milwaukee Police Department.

**RESPONSE: To the extent that this information is contained within Defendant Mattioli's MPD HR file—production will be made subject to redactions and/or a protective order.**

23.     For any general liability, police professional, excess liability, umbrella, and/or homeowner insurance policy, for which you were considered to be insured pursuant to the policy, in effect in

2020 (when the incident occurred), and/or in effect in 2023 (when the lawsuit was filed), any and all documents related to applications for insurance submitted by the insured, policies, declarations regarding coverage, loss runs, loss history, loss control reports, notices related to claims, notices related to precautionary claims, claim investigation files, claims reports, inspection reports, correspondence to insured regarding coverage, internal reports to or from underwriting, internal memoranda to or from underwriting, all underwriting documents, reservations of rights letters, endorsements, or documents discussing changes to insurance coverage.

**RESPONSE: Objection. This request seeks documents not within the custody and control of defendant. Subject to and without waiving that objection, Homeowners Policy No.** ███████ **issued by American Family Insurance to Michael Mattioli accompanies these responses.**

Dated this __10__ day of April 2024.

AS TO INTERROGATORIES

_Michael Mattioli_ (signature)
MICHAEL MATTIOLI

Subscribed and sworn to before me this _____ day of April 2024.

_____
Notary Public, State of Wisconsin
My commission expires _____

Dated this 8th day of April 2024

AS TO OBJECTIONS, REQUESTS FOR ADMISSION, AND REQUESTS FOR PRODUCTION OF DOCUMENTS

**WIRTH + BAYNARD**
Attorneys for Defendant, Michael Mattioli

_/s/ Joseph M. Wirth_____
Joseph M. Wirth (WI State Bar No. 1012080)
9898 West Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: (414) 291-7979 / F: (414) 291-7960
Email: jmw@wbattys.com

22

SA-038

**Milwaukee County Medical Examiner**
**933 W. Highland Avenue**
**Milwaukee, WI 53233**

## AUTOPSY PROTOCOL

NAME: ACEVEDO, JOEL A.          SEX: MALE          AGE: 25 YEARS

DOB: ████ 1994

DATE OF DEATH:          APRIL 25, 2020          TIME: 1623

DATE OF AUTOPSY:          APRIL 28, 2020          TIME: 0805

PLACE OF AUTOPSY:          Milwaukee County Medical Examiner's Office

PERFORMED BY:          Brian L. Peterson, M.D.
                                     Medical Examiner

CAUSE OF DEATH:          Anoxic Encephalopathy due to Traumatic Asphyxia

MANNER OF DEATH:          Homicide

Signed _[signature]_ Brian Peterson, MD          4-29-2020
                           Medical Examiner          Date Signed

NOTES BY: DSK, MEDICAL TRANSCRIBER

SA-039

**Milwaukee County Medical Examiner**
**933 West Highland Avenue**
**Milwaukee, WI 53233**

## AUTOPSY PROTOCOL

**Final Diagnoses:**

I     Marked cerebral edema with encephalomalacia (anoxic encephalopathy)

II     Petechial hemorrhages, face and neck (antemortem photographs)

III     Acute bronchopneumonia

IV     Acute hemorrhagic pancreatitis

V.     Obesity (BMI 33)

VI     Status post recovery of heart

1

Case 2:23-cv-00489-BHL    Filed 09/10/25    Page 2 of 5    Document 80-5

SA-040

Case: 26-1555   Document: 13   Filed: 06/29/2026   Pages: 81

**WITNESSES:**

Personnel present during portions of the autopsy include: Brian L. Peterson, MD, Medical Examiner; Marissa L. Ordinans, Forensic Pathology Supervisor, and District Attorney Investigators Sarah Blomme and Kent Corbett.

Before the autopsy begins, nail clippings are collected.

**CLOTHING:**

None.

**EVIDENCE OF MEDICAL THERAPY:**

Nasogastric and orotracheal tubes are appropriately positioned. A dialysis catheter is in the right side of the neck. A blood pressure cuff is on the left upper arm. Intravenous catheters are in the right antecubital fossa and the right inguinal fossa. A line is in the left radial artery. A Foley catheter attaches to a collection device containing approximately 20 mL of urine. A rectal tube is in place, a pulse oximeter is on the right index finger. A sutured incision on the mid chest is indicative of recovery of the heart for donation.

## GENERAL EXTERNAL EXAMINATION

The nude, cool, unembalmed body is that of a well-nourished, well-developed, Hispanic male that measures 74 inches, weighs 255 pounds (BMI 33), and appears consistent with the listed age of 25 years. The scalp hair is black, wavy, and up to 2 inches in length, and a mustache and beard are worn. The corneae are clear. The sclerae and conjunctivae are unremarkable. The dentition is natural and in good repair. Facial injuries will be described below. The neck is unremarkable externally. The breasts and chest are unremarkable. The abdomen is obese and protuberant. The external genitalia are those of a circumcised adult male with bilaterally descended testes. The extremities, back, and anus are unremarkable. Lividity is dorsal but not fixed, and rigor mortis is easily overcome in the extremities

**EVIDENCE OF INJURY:**

Fine petechial hemorrhages are above each eye, on the undersurface of each supraorbital ridge. Examination of antemortem photographs received via e-mail on April 22nd reveals more robust petechial hemorrhages above the eyes, on the cheeks, and on the neck.

## GENERAL INTERNAL EXAMINATION

### BODY CAVITIES:
The body is opened using the standard Y-shaped and intermastoid incisions and the chest plate is removed. There are no adhesions or abnormal collections of fluid in the pleural, pericardial, or peritoneal spaces; the heart is absent, having been recovered for donation. All organs are in normal anatomic position, and the midline anterior abdominal fat layer measures 1 inch.

### CENTRAL NERVOUS SYSTEM:
The scalp is reflected to reveal an intact calotte, there is no subgaleal hemorrhage. The calotte is removed to reveal intact dura mater without epidural hemorrhage. The dura mater is incised and reflected to reveal symmetrical cerebral hemispheres, without subdural or subarachnoid hemorrhage. The structures at the base of the brain are intact, including the cranial nerves and blood vessels. The upper spinal cord is unremarkable. Coronal sections through the cerebrum and transverse sections through the cerebellum and brainstem reveal marked cerebral edema with encephalomalacia. The brain weighs 1510 grams.

### NECK:
The strap muscles are uninjured. The hyoid bone, cricoid, and thyroid cartilage are intact.

### GASTROINTESTINAL TRACT:
A longitudinal section through the tongue reveals no lesions. The mucosa of the esophagus, stomach and duodenum is intact, and the gastric lumen is empty. There are no abnormalities of the small and large intestines, and the appendix is present.

### RESPIRATORY SYSTEM:
The mucosa of the larynx, trachea, and bronchi is pink-tan and unremarkable; purulent fluid is within each mainstem bronchus. The normally lobated lungs are covered by glistening pleura. Sections reveal a congested parenchyma exuding moderate amounts of serosanguineous fluid on cutting; there are no focal lesions. The pulmonary arteries and veins are normally distributed and unobstructed. The right lung weighs 390 grams and left lung weighs 340 grams

3

Case: 26-1555    Document: 13    Filed: 06/29/2026    Pages: 81

**SA-042**

## RETICULOENDOTHELIAL SYSTEM:

The 420 gram spleen is covered by a smooth intact capsule. Sections reveal normal red pulp and normal distribution of white pulp. The regional lymph nodes and bone marrow are grossly unremarkable.

## HEPATOBILIARY SYSTEM:

The 3,390 gram liver is covered by a glistening, intact capsule. Sections reveal a uniform brown parenchyma with no focal lesions. The external biliary tree is normally distributed, and the gallbladder is present  The pancreas is markedly expanded. Sections reveal hemorrhagic pancreatitis with multiple abscesses.  Inflammation extends into peripancreatic fat as well as into the root of the mesentery. The ducts are patent.

## GENITOURINARY TRACT:

The renal capsules strip with ease to reveal smooth cortices  The cortices, measuring up to 0.9 cm in maximum thickness, are well demarcated from the unremarkable medulla and collecting system. The ureters follow the normal course to the urinary bladder is empty. The prostate gland and testes are palpably unremarkable. The right kidney weighs 350 grams and the left kidney weighs 310 grams.

## ENDOCRINE SYSTEM:

The pituitary gland, thyroid gland, and adrenal glands are normal in size, shape, and location.

## MUSCULOSKELETAL SYSTEM:

There are no bone or joint abnormalities. The skeletal muscle is red-brown and firm

## SPECIMENS:

At the time of autopsy, DNA blood card, stock tissue sections in formalin, fingernail clippings, vitreous humor, and antemortem specimens are retained.

4

SA-043



# MILWAUKEE POLICE DEPARTMENT

### STANDARD OPERATING PROCEDURE

220 – ARREST AUTHORITY

| GENERAL ORDER: 2017-15<br>ISSUED: April 24, 2017 | EFFECTIVE: April 24, 2017 | REVIEWED/APPROVED BY:<br>Assistant Chief Carianne Yerkes<br>DATE: February 23, 2017 |
| --- | --- | --- |
| ACTION: Amends General Order 2015-31 (June 29, 2015) | | WILEAG STANDARD(S): 1.6.1, 1.7.2, 1.7.4, 1.7.5, 1.7.6 |

### 220.00  PURPOSE

The purpose of this standard operating procedure (SOP) is to define the authority to make arrests as defined in Wis. Stat. § 968.07 and provide guidelines for effecting arrests, both with and without a warrant. These guidelines ensure that rights and privileges are afforded to citizens during arrest situations. Furthermore, this SOP identifies the authority of the sworn officers to use alternatives to arrest.

### 220.05  POLICY

It is the policy of the Milwaukee Police Department that all arrests made by members both on or off duty shall be conducted professionally and in accordance with established legal principles.

### 220.10  DEFINITIONS

A. ARREST

Taking or detaining of a person by word or action into custody so as to subject their liberty to the actual control and will of the person making the arrest. There must exist the intent to take into custody and a corresponding understanding of the person arrested that he or she is in "custody", although no formal declaration of arrest is required.

B. ARREST WARRANT

A written order issued by a judge, magistrate or other proper authority that commands a law enforcement officer to place a person under arrest.

C. PROBABLE CAUSE

That quantum of evidence which would lead a reasonable police officer to believe that the defendant committed a crime. It is more than a hunch or suspicion, but less than the evidence required to convict at trial.

D. CRIME

Defined by Wis. Stat. § 939.12 as conduct which is prohibited by state law and

**SA-044**

punishable by fine or imprisonment or both.

E. LAW ENFORCEMENT OFFICER

A person employed by the city of Milwaukee who is responsible for detecting and preventing crime and enforcing laws or ordinances and who is authorized to make arrests for violations of the laws or ordinances they are employed to enforce Wis. Stat. § 165.85(2)(c).

F. ON-DUTY

Those hours the law enforcement officer is regularly scheduled to work as part of his/her normal hours of work, including authorized overtime hours.

G. PERSONALLY INVOLVED

A situation where the off-duty member, a family member, or friend becomes engaged in a dispute or incident involving a personal matter with the person to be arrested or any other person connected with the incident. This does not apply to situations where the off-duty member is a victim of a crime.

H. POLICE ACTION

For purposes of this policy, is lawful action which a member takes including, but not limited to, investigation, arrest, attempted arrest, use of force, rendering aid, and assistance.

I. DISCRETION

The ability to apply reason, based on intelligent, non-biased decisions, guided by professional values, to include the Code of Conduct, department policy and situational variables. This does not apply to offenses and violations in which the suspect, by law, must be arrested. The use of discretion includes the use of alternatives to arrest.

## 220.15  ON-DUTY ARRESTS AND PROCEDURE (WILEAG 1.6.1, 1.7.4)

A. PROCEDURES FOR ARRESTS

1. In order for an arrest to occur, an officer must have the intent to take a person into custody and the person should have an understanding that he/she is arrested and is in custody.  When making an arrest, an officer shall:

   a. Identify him/herself as a police officer. (If it is apparent by the wearing of a uniform or other means that the person making the arrest is a police officer, no further identification is necessary.)

   b. Restrict the arrested subject's movement using only the amount of reasonable force necessary to overcome their resistance.

| General Order 2017-15 | ARREST AUTHORITY | Page 3 of 9 |
|---|---|---|

    c. When an arrested person is taken into physical custody, the arresting officer shall be responsible for completing the required reports.
(WILEAG 1.7.4.4)

    **Note: Although officers may inform the subject that they are under arrest no formal declaration of arrest is required.**

2. Arrests with a warrant

    a. Under Wisconsin law, there are four situations in which a law enforcement officer is statutorily authorized to make an arrest:

        1. With a warrant commanding arrest of the person.

        2. With belief on reasonable grounds that a warrant for the person's arrest has been issued in this state.

        3. With belief on reasonable grounds that a felony warrant has been issued for the person's arrest in another state (a Wisconsin law enforcement officer shall not arrest on a misdemeanor warrant issued from another state).

        4. With belief on reasonable grounds that the person is committing or has committed a crime.

        **Note: The "reasonable grounds" specified in the statute is the same as "probable cause."**

3. Arrests without a warrant

    a. An officer may make an arrest without a warrant if the officer has probable cause to believe a person is committing or has committed a crime.

    b. An officer may enter a person's home to arrest a person without a warrant, when given permission by a person of "legal standing" or probable cause plus "exigent circumstances" must exist (exigent circumstances do not include minor traffic offenses. *Welsh v. Wisconsin*). Exigent circumstances include:

        1. The immediate threat of escape;

        2. The immediate threat of destruction of evidence;

        3. The immediate threat of death or great bodily harm to the officer or another;

        4. When in pursuit of a fleeing subject for whom the police have probable cause to believe has committed a jailable offense, an officer may enter a home without a warrant if he/she has probable cause to believe the subject is in the home. This hot pursuit exception is limited to a jailable offense situation and to a chase scenario.

**SA-046**

Officers shall use discretion when employing this tactic as it may not always be the best practice, or the safest choice, to chase a fleeing subject into a home for a minor misdemeanor even though the entry would be lawful.

**Note: If exigent circumstances do not exist, it is necessary to obtain an arrest warrant or consent to enter the premises from someone authorized to give consent to make an arrest of a person in his/her own residence.**
(WILEAG 1.7.4.1, 1.7.4.2)

B. Members may conduct official investigations and make arrests within Milwaukee County.

   1. Members may arrest a subject whom the member has observed committing a crime.

   2. Members may arrest a subject on probable cause when the member has not witnessed the commission of the crime.

   3. Members may arrest any person within Milwaukee County for whom a federal state or municipal warrant has been issued.
   (WILEAG 1.6.1.3)

C. Members outside Milwaukee County may arrest a person or provide aid or assistance anywhere in the state if:

   1. The member is on-duty and on official business.

   2. The member is taking action the member would be authorized to take under the same circumstances in Milwaukee County.

   3. The member is responding to any of the following:

      a. An emergency situation that poses a significant threat to life or bodily harm.

      b. Acts the member believes, on reasonable grounds, constitute a felony.

D. Members in fresh pursuit may follow and arrest a person in another jurisdiction outside of Milwaukee County but within the state of Wisconsin for the violation of any law or ordinance the member is authorized to enforce.

## 220.20  DISCRETION (WILEAG 1.7.6)

Members are authorized to use discretion in their decision to arrest or not arrest.

A. Members should use professional judgment by taking the following factors into consideration when deciding whether to arrest or not arrest a citizen.

   1. The seriousness and nature of the offense.

**SA-047**

2. The potential that arrest will effectively resolve a conflict.

3. The availability of legal alternatives to arrest that would adequately resolve the conflict.

4. The likelihood that the citizen will be deterred from future violations by warning and education.

5. The member's belief that the citizen made an honest mistake in violation of the law.

B. Members shall not consider race, economic status, ethnicity, gender, or any other social status to determine the decision to arrest or not arrest.

## 220.25 ALTERNATIVES TO ARREST (WILEAG 1.7.5)

A. WARN AND ADVISE

1. Members may advise by use of a verbal warning for matters related to city ordinance violations.

2. Members shall advise by use of a traffic warning card (on TraCS) related to traffic violations.

   **Note: Members shall not issue verbal warnings for traffic violations. Members may mail the traffic warning form to the violator with the permission of their supervisor if their department vehicle is not equipped with a mobile data computer (MDC), the member is experiencing a software/hardware malfunction (e.g., printer problems or the MDC is not operational), or in exigent circumstances (e.g., the member is preempted for a call for service).**

B. The use of citations in lieu of arrest for misdemeanor violations, when appropriate and when an arrest is not mandated by law.

C. Order in to the district attorney's office for review of the matter.

## 220.30 OFF-DUTY ARRESTS AND AID

A. ARREST AUTHORITY

An off-duty member may arrest or provide aid or assistance anywhere within the state of Wisconsin if:

1. The member is responding to an emergency situation that poses a significant threat to life or bodily harm.

2. The member is taking action that the member would be authorized to take under the same circumstances in Milwaukee County while on-duty.

B. ARREST LIMITATIONS

1. The member's actions must be objectively reasonable. All aspects of the situation, including the member's abilities, training, experience, availability of equipment, communications, as well as a tactical risk assessment, shall be taken into consideration prior to deciding to act. The opportunity and/or means to have on-duty officers safely respond prior to acting must be weighed. When practicable, the member should contact the law enforcement jurisdiction in lieu of, or prior to, intervening. In some instances, it may be more beneficial to be a good witness rather than attempt to physically intervene.

2. Members are discouraged from taking police action when the member has consumed alcohol or any other substance which could impair rational action or conduct.

3. The member shall not be personally involved in the incident underlying the arrest.

4. The member shall not be engaged in off-duty employment where the member's actions are in furtherance of the interests of the private employer.

5. If the member is unarmed, at minimum, the member shall possess a department issued identification card. If the member is armed with his or her duty weapon or other approved handgun, the member must possess both badge and identification card. The member shall display these identifiers as soon as practicable.

6. The member shall abide by federal and state laws, as well as department standard operating procedures.

C. RESPONSE TO ON-DUTY PERSONNEL

1. On-duty personnel have primary authority at any scene.

2. The off-duty member shall immediately identify him or herself as an off-duty officer and comply with all the commands of the on-duty personnel.

   **Note: There have been a number of documented incidents of off-duty officers killed by on-duty officers who were unaware the individual was an off-duty officer.**

3. The member shall be cooperative, provide all requested information to on duty personnel and remain on scene until released by on-duty personnel.

## 220.35 LIABILITY PROTECTION (WILEAG 1.6.1)

For purposes of civil and criminal liability, any member, whether on-duty or off-duty, acting under Wis. Stat. § 175.40(2),(5), (6) and (6m), is considered to be acting in an official capacity. This protection does not extend to willful acts intended to cause injury to persons or damage to property, or to those actions that the member knew, or reasonably should have known, were in conflict with the law or established policies of the department.

The authority granted under Wis. Stat. § 175.40(5), 175.40(6) and 175.40(6m) is in addition to any other arrest authority, including authority granted under any charter.
(WILEAG 1.6.1.2, 1.6.1.3)

## 220.40 INFORMING THE ARRESTEE (WILEAG 1.7.2, 1.7.4)

Upon making an arrest, either on or off-duty, the arresting officer shall inform the arrestee as soon as practicable of the nature of the offense or warrant for which they are being arrested. For safety reasons, the member may initially mislead the arrestee as to the nature of the offense or warrant. Officers not in uniform shall display their badge and identification card.

A.  Arrestees shall be advised of their Miranda rights before an interrogation.

B.  Arrestees must waive the Miranda rights before an interrogation can begin.

   1.  The waiver must be clearly stated to interrogating members.

   2.  If the arrestee does not waive *Miranda,* no questioning shall be conducted beyond that necessary to accomplish booking procedures.

   3.  If the arrestee initially waives the *Miranda* right to counsel but later decides to reassert it, questioning must cease immediately regarding the crime for which the arrest was made, for any other crime, or by any other law enforcement agency unless:

      a.  An attorney representing the arrestee is present during questioning.

      b.  The arrestee voluntarily initiates a further interview, or

      c.  The arrestee has been subject to a break in custody of 14 days or more.
         (WILEAG 1.7.4.3)

## 220.45 DEPARTMENTAL NOTIFICATIONS

A.  As soon as practicable, any member taking on-duty police action outside of the city of Milwaukee under Wis. Stat. § 175.40(6) shall notify their shift commander of the details and facts of the action.

B.  As soon as practicable, any member taking police action under Wis. Stat. § 175.40(6m), whether inside or outside the city of Milwaukee, shall notify their shift commander of the details and facts of the action. If the off-duty action occurred within the city of Milwaukee, a supervisor shall respond to the scene.

## 220.50 PRISONER PICKUP IN ADJACENT COUNTIES

When the department is notified that authorities in adjacent counties are holding a person on a municipal or state warrant, which the department has entered into the National Crime Information Center (NCIC) system, the respective Criminal Investigation Bureau division

**SA-050**

commander shall notify the Technical Communications Division to arrange for the conveyance and processing of that person. The conveyance shall be made utilizing a vehicle equipped with a security shield.

## 220.55  NOTIFICATIONS TO OUTSIDE JURISDICTIONS

Members conducting investigations that require contact with persons in other jurisdictions shall, absent articulable exigent circumstances, notify that law enforcement agency of the nature, purpose, and location of the investigation prior to conducting said investigation. In all instances, notifications of investigations conducted, arrests or other actions made, both on and off-duty, shall be made to the law enforcement agency of the jurisdiction in which the activity occurred as soon as practical.  Notification information should include:

1.  The nature of the offense which precipitated the investigation, arrest or action.

2.  The identity of any person(s) arrested.

3.  The identity of all department members involved in the actual investigation, arrest or action if requested.

4.  Any factual data pertinent to the incident which would be significant information to the jurisdictional agency, such as any injuries to any persons or damage to any property as a result of activities related to the arrest.

5.  Any requests for resources or coordinated activity essential to conduct the investigation or arrest.

## 220.60  NOTIFICATION TO OTHER FACILITIES

Members conducting investigations in facilities such as hospitals, schools, or any facility with private security on the premises shall, whenever possible notify the security department of the investigation prior to conducting said investigation. In all instances, notifications of investigations conducted, arrests or other actions made, both on and off-duty, shall be made to the security department of the facility as soon as practical.

## 220.65  CONCURRENT JURISDICTION (WILEAG 1.6.1)

A.  Various county, state, and federal law enforcement agencies other than the Milwaukee Police Department have the authority to exercise police powers within the city limits. These agencies include, but are not limited to, the:

1.  Milwaukee County Sheriff's Department

2.  University of Wisconsin-Milwaukee Police Department

3.  Marquette University Police Department

4.  Wisconsin State Patrol

**SA-051**

| General Order 2017-15 | ARREST AUTHORITY | Page 9 of 9 |

5. Wisconsin Department of Justice - Division of Criminal Investigation

6. Various federal law enforcement agencies

B. The Milwaukee County Sheriff's Department has primary jurisdiction to conduct investigations on I-94, I-43, I-894, US 45, and Wisconsin State Trunk Highway 341 to include all on and off ramps.

C. The Milwaukee County Sheriff's Department has primary jurisdiction to investigate incidents on Milwaukee County property located within the city limits. The Milwaukee Police Department also has concurrent jurisdiction to patrol and investigate incidents that occur on county property located within the city limits.

D. The University of Wisconsin-Milwaukee Police Department and the Marquette University Police Department are the primary agencies to investigate incidents on the grounds of their respective universities located within the city limits. The Milwaukee Police Department also has concurrent jurisdiction to patrol and investigate on the grounds of these respective universities within the city limits.
(WILEAG 1.6.1.3)

EDWARD A. FLYNN
CHIEF OF POLICE

EAF:mfk

SA-052

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF WISCONSIN

JOSE ACEVEDO, individually, and
as a Special Administrator of the
ESTATE OF JOEL ACEVEDO,

                Plaintiff,

      v.        Civil Action No. 23-cv-00489

MICHAEL MATTIOLI, et al,

                Defendants.
----------------------------------------x

         DATE: June 5, 2025

         TIME: 2:07 p.m. (Central)


      Deposition of GRISELDA ALDRETE, taken by

the Respective parties, held via videoconference

by all participants, before MICHAEL WILLIAMS, a

Notary Public and Registered Professional Court

Reporter.

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:

THE LAMARR FIRM
5718 Westheimer Rd, Suite 1000
Houston, Texas 77057
BY: B'IVORY LaMARR, ESQ.
        -and-
    JACOB LITIGATION, INC.
P.O. Box 837
Mechaniesburg, Pennsylvania 17055
BY: DEVON M. JACOB, ESQ.
djacob@jacoblitigation.com

FOR THE DEFENDANT MICHAEL MATTIOLI:

WIRTH & BAYNARD
9898 W. Bluemound Road, Ste. 2
Wauwatosa, Wisconsin 53226
BY: JASMYNE M. BAYNARD,ESQ.
        -and-
    AMANDA MELROOD, ESQ.
jmb@wbattys.com

FOR THE DEFENDANTS ROBERT ROACH and ALFONSO
MORALES:

CITY OF MILWAUKEE CITY ATTORNEY OFFICE
800 City Hall
200 East Wells Street
Milwaukee, Wisconsin 53202
BY: CLINT B. MUCHE, ESQ.
cmuche@milwaukee.gov

FOR THE WITNESS GRISELDA ALDRETE:

STANFORD LAW OFFICES, SC
225 E. Fairmont Avenue
Milwaukee, Wisconsin 53217
BY: PETER A. STANFORD, ESQ.
pas@stanfordlawoffices.com

**Page 3**

                I N D E X
WITNESS          EXAMINATION BY         PAGE
Griselda Aldrete   Devon Jacob            4
                   B'Ivory LaMarr       81, 122
                   Clint Muche            92
                E X H I B I T S
PLAINTIFF                               PAGE
1       Directive dated 7-20-2020        81
2       Email dated 6-8-20               81
5       Email dated 6-2-25              130
DEFENDANT                              PAGE
3       Text messages dated 5-12-25      96
4       Letter dated 5-15-20             99

(Exhibits 1-4 retained by attorney.)

     L I T I G A T I O N   S U P P O R T
              I N S E R T S
DESCRIPTION                        PAGE/LINE
            (None)
     M A R K E D   F O R   R U L I N G
QUESTION                           PAGE/LINE
            (None)
   R E Q U E S T S   F O R   P R O D U C T I O N
DESCRIPTION                        PAGE/LINE
            (None)

**Page 4**

THE REPORTER:  The attorneys appearing in this deposition acknowledge that I am not physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.

The parties and their counsel further agree that while I am a licensed notary/court reporter, the witness may be in a state where I am not licensed.  The parties stipulate that this deposition may be taken before me.

If any party does have an objection to this manner of reporting or anything stated above, please state so now.  Hearing none, we can proceed.

GRISELDA ALDRETE, called as a witness, having first been duly sworn, testifies as follows:

EXAMINATION

BY MR. JACOB:

Q.    Can you stare your full name for the record.

A.    Yes, Griselda Aldrete.

**Page 5**

Q.    Miss Aldrete, if it's okay, my name is Devon Jacob.  I represent the family of the decedent in the case involving Mr. Mattioli, or former Officer Mattioli, for which you're here to give a deposition for today along with B'Ivory LaMarr.  He's cocounsel, and just so we're clear on the record, you have spoken to both of us at some point with respect to matters related to this; is that correct?

A.    Yes.

Q.    And we didn't discuss what you need to say or should say during a deposition, correct?

A.    No.

Q.    Well, it is correct that we didn't?

A.    Right.

Q.    All right.

I'm going to assume you know how a deposition works because you're an attorney, so; but, in any case, just so we're all clear on the record, if at any point in time you need a break, just let me know.  You don't need to tell me why.

The court reporter -- we have one here -- he's to, of course, create a clear record and a record for all attorneys, not just myself,

GRISELDA ALDRETE
JUNE 05, 2025

JOB NO. 1724818

Page 6

to use in the litigation.

You know a deposition is not a conversation. It's in that you might be able to guess where I'm going with something. I might be able to guess where you're going with something, but the court reporter has two hands. It's not one for you, one for me.

So I'm going to do my best to let you finish your answers before I begin my questions and, of course, I ask that you do the same even if you can guess, just try to let me get the full questions out before you begin, okay?

A. Perfect.

Q. All right.

Is there any reason you wouldn't be able to answer truthfully questions here today?

A. No.

Q. There's no medication or medical condition that would prevent you from doing so?

A. No.

Q. All right.

And it's okay to proceed? You're ready to go?

A. Ready to go.

Page 7

Q. All right.

Am I correct that at some point in time in the last, I think it was five years, you worked for the FPC; is that correct?

A. Yes, I was employed by the City of Milwaukee as the fire and police commission executive director from July of 2019 to about October of 2020.

Q. And, in that capacity, what were your duties and responsibility with respect to the FPC?

A. My day-to-day duties were to manage the office and that included managing internal staff, which included office staff, a chief of staff, investigators, but, also, more importantly, do the testing for the fire and police departments to create the list for actual firefighters and police officers promotional lists so that each entity could promote from within, and then also manage the operations of the commissioner, which meant any business that needed approval from the actual commissioners I kind of operated as the secretary of the board as well.

Q. So you're the one that made it

Page 8

happen basically; is that fair?

A. Yes.

Q. All right.

You weren't making the decision so to speak but you were implementing the decisions?

A. Yes, the executive director and all commissioners are appointed by the Mayor of Milwaukee. I worked directly at city hall. The commissioners are appointed by the mayor and they're a separate board that all of us require common council approval; but I did not have any voting authority to make any decisions as the promotions, hiring and firings of any of the officers both at the fire departments and police department and, also, I, you know, when there was a recommendation -- I led the investigations if there were, you know, kind of like citizen complaints and whatnot but, ultimately, the disciplinary actions were left to the commissioners.

Q. Okay.

So with respect to leading the investigations, can you explain what your duties and responsibilities were.

A. So at the time I had three internal

Page 9

fire police commission investigators.

So any time there was a complaint from a citizen that would come to our office it was our duty to investigate it.

So I would deploy one of the three investigators to do their fact-finding and then, ultimately, the report would come to me. I'd read it over or approve it and then present my recommendation to the commission.

Q. So the hierarchy, would it be, is it fair to say, during an investigation, it was the investigators answering to you and you were answering to the board?

A. Yes.

Q. And your role was to, understanding, oversee the investigation and, also, direct the investigation; is that fair?

A. Yes, and, also, if an investigator was having problems getting information from me, their department I could step in and request that information directly be sent to me.

Q. And with that, with those duties and responsibilities, did you also have the authority to compel certain department's chiefs, other personnel to respond to you?

Page 10

A.    Yes.

Q.    And did you have an enforcement mechanism if they did not comply with your requests or directives?

A.    No, at the time, when I started because I was there for about a year-and-a-half, I established a cadence to meet with each chief once a week in person, and that would be for them to -- mutual conversation.

I would share any of the concerns I had or any questions I had, or that was also a time for each department to share, you know, news about potential crisis or things that were coming down and things, specifically the police department, if there was a body camera that was about to be released and it was going to hit the news, you know, kind of giving us an opportunity to preview it ahead of time, share with the commission, share with the mayor and common council because, ultimately, we were dealing with I would say a very tumultuous time during my tenure, not just locally but national and global, too.

Q.    Okay.

So who decides what gets

Page 11

investigated, what gets investigated or was it just by policy certain types of things are investigated?

A.    We had a duty to investigate every complaint, as small as it would be to as huge as it would be at a portal within the city website where anyone could file a complaint; and when I say citizen complaints we're not -- we weren't just talking about citizens, also fellow fire and police officers could file a complaint against another officer or leadership for us, right.  We often got complaints about us, the body as well.

Q.    I'm sure.  It's a political post that you're in; am I correct?

A.    Yes.

Q.    And you're essentially working with politicians.  You have the FPC board.  You have the police chiefs.

So is it fair to say it was a very public position?

A.    Very public and, in fact, the position was probably the second most political position that the mayor appointed.  I always said it is like I had so many different bosses, right, and so you have the court of public opinion.  You

Page 12

have the common council, the mayor, commissioners, staff and then the police and fire department so, yes.

Q.    So, or excuse me, a complaint comes in.  There's going to be an investigation because everything needed to be investigated.

What role does the board have in -- during the course of the investigation itself or is it just at the end, the decision making?

A.    Just at the end, but there is communications, you know, regularly.  I would communicate regularly with the board chair at the time and kind of say these are kind of things that are going down.

I'm not a fan of surprise, so I would know never want to surprise the commissioners because the commissioners had an email address, and they would also get consistent emails from people; and so I was, as a courtesy because it was sort of more a volunteer position for them, even though a lot of them argued it became a full-time job, to kind of keep them abreast of what was happening.

And so even just the, you know, the time frame of completion of probably a high

Page 13

profile investigation was something we talked about and, also, we talked about it publicly as well as an agenda item, and that's a public record on the city's website.  All of our meetings were televised.

Q.    So is it fair to say you're in charge of the investigation and the investigation file.  So what gets into that file you're the gatekeeper; is that fair?

A.    Yes.

Q.    And so the commission doesn't hear about it unless it reaches that file?

A.    Unless it reaches, yes, you know, and kind of just like what are the commission and what are the fire police commission topics of the day, if you will.

Q.    All right.

I guess asked a different way, it's not considered as part of the investigation by the commission itself unless you allow it into the file?

A.    Yes.

Q.    All right.

And with respect to the FPC itself, I know you said there was a lot of communication,

Case 2:23-cv-00489-BHL    Filed 09/10/25    Page 5 of 52    Document 80-8

SA-056

Page 14

not a lot. I'm sorry. I didn't mean to put -- but that there's communication between you and the board with respect to certain complaints as the investigation is on going, correct?

A. Yes.

Q. And does the board or did the board direct you as far as specific things they were interested in about any particular case that they wanted to make sure you covered within the investigation?

A. Yes, and then, also, the commission itself had a lot of authority. They could also randomly want to investigate anything and everything about the departments they oversaw.

So even if a complaint wasn't, if you will, wasn't coming in, if there was a question about something in regards to their policy and procedures for body cam release, right, or any SOP, so standard operating procedure we were in charge of also amending those if they need be.

They could request them at any point from any of the departments, and then I'd have to follow up and make sure that that got completed as well.

Page 15

Q. So if the commission decides, okay, there's been no complaint but we want to look into X issue, does that investigation take the same path where you oversee it and you work it up with your investigators? You create the file and then hand it back to the FPC saying here's the facts?

A. Yes, and most of those discussions, if it involved the vote, it would have to have been publicly. So there was also so much limited opportunity for us because like you I can't sway their vote and that's not my job.

My job is just to provide the information, but publicly and legally they would have to discuss it in public, in a public meeting.

Q. So you're the fact-finder and they're the, you know, discretionary decision making; is that correct? That's a yes?

A. Yes.

Q. All right. Fair enough.

And does that include employment --

(Technical difficulty.)

A. You cut off. Can you repeat the question.

Page 16

Q. Sorry.

And does that include employment matters?

A. Yes.

Q. Okay.

And so you also then necessarily would have to be in executive session at times with the board, correct?

A. Correct.

Q. And -- okay.

So you sit in executive session. You review certain things with the board. The board does public meetings and, you know, does their business in public with respect to voting on certain outcomes.

But you're involved every step of the way from the time the complaint starts until the final decision, fair?

A. Fair, yes.

Q. Now, with respect to internal affairs matters in the police department, are those reported to the commission or are certain ones reported to the commission?

A. Certain ones, specially high profile ones. I mean, we would usually, and that's when

Page 17

I meant every week when I would sit down with each chief they would also just offer information in terms of, you know, we're doing some restructuring or you might hear about a certain, you know, member of our, you know, entity that's being recommended or we're going to put forth suspension. So that also got on the record.

So normally that would also come to the commission as well.

Q. If there's an internal affairs investigation, there's a decision made, discipline is going to be issued, does the FPC have to sign off on the discipline or can the police department separately discipline and then the FPC also investigates certain threats and do their own type of discipline?

A. Yes, each chief has sole discretion to also hire and fire and write internally. We -- obviously, if it's an assistant chief or someone high profile we would probably be notified and unless we did 100 percent we, you know, the commission could ask either chief to provide documentation as to why they were making that decision.

But, ultimately, and vice versa when

Page 18

they wanted to promote from within the department the chiefs couldn't. That have to come through a list through the fire and police commission and that would have to be approved; and when those promotions would or wouldn't happen, we would get each individual's personnel file and review that, and I would make recommendations along with the chiefs whether that person was fit to be promoted or not.

Q. It sounds like your position also was a liaison between these, the fire, the police and the commissioners; is that fair?

A. And the mayor and the common council and the public, yes.

Q. Wonderful. I'm sure that was a lot of fun while you were doing that.

A. My hair is still in tact and black. Some gray in there.

Q. At least you worked with people who were not very opinionated, right?

A. Right.

Q. Fair enough.

So, again, going back to internal affairs investigations though, was there a protocol or stand by which the commission always

Page 19

had to be notified of certain types of internal affair matters?

A. Usually, the chiefs might also reach out directly to certain commissioners. There was a time pre my tenure that I believe the police and fire chief directly communicated with the board chair or certain members of the commission that they, you know, had a relationship with.

I mean, I think we had one commission who had been serving for over nine, 10 years, and so right there it's people that had been there way longer than my tenure.

And so what I wanted to do when I came in though is re-establish sort of the oversight of our office and make sure there were clean lines of communication and documentation of specifics as well.

Q. Okay.

But, again, and maybe I'm asking it wrong, but, like, for instance, if there's an officer that's going to be disciplined because of showing up five minutes late every day, is that something the FPC is going to be made aware of?

A. No.

Q. By the same token, if an officer is

Page 20

going to be investigated for excessive force or a significant excessive force, like using a hand gun or something, I'm assuming the FPC is absolutely going to be notified; is that fair?

A. Yes, yes.

Q. So where is it written or how is it known which ones needed to be reported to the FPC and which ones did not?

A. I think, I mean, at the time I think it was up to each chief's discretion, like I mentioned, especially if it would be something that would be public, right; and, at the time, during 2019 and 2010, given just the community interest in police and fire and our body, a lot of things were making the news.

I mean, we had newscasters in every one of our meetings which I'm told pre my time really no one was watch watching our stuff, right, but it just turned out that people were really, really interested.

Q. Okay.

So let's say there's an officer though who is subject to repeated discipline within the department.

That officer's continuation as a

Page 21

police officer, is that up to the chief or is that up to the FPC?

A. The chief.

Q. And is there anything, any override that the FPC can do to remove that officer?

A. Not unless we were made aware of it and, usually, how we would find out whether an officer had been disciplined is if we were asking for their personnel file, right; but, I mean, at the time there was about 200 police officers and about 1700 firefighters, and so I wasn't actively looking at each of their files, if you understand.

But, usually, if they were going up for promotion, yes, we would get each and every one of those individuals personnel file and if we had questions about their track record, we would then dig deeper before we put them on a list or told each chief that we're not going to approve that one.

Q. Okay.

I heard you say though with respect to promotions, the FPC had to be consulted, the advice and consent of the FPC, but with respect to just internal discipline, the chief could fly

Case 2:23-cv-00489-BHL    Filed 09/10/25    Page 7 of 52    Document 80-8

SA-058

Page 22

solo on that?

A.    Each chief, yeah, fire and police.

Q.    So the chief would be able to retain the officer without the FPC's permission but could not promote the officer without the FPC's permission; is that correct?

A.    Yes, and the firefighters and officers and chief, right, they're city employees, too.  So there's also different protocols, too.  They have unions, right, and so there are a lot of moving parts.

Q.    No doubt.

So with respect to the union, since you brought that up for a bit, did you have any duties and responsibilities with respect to interacting with the union?

A.    No, I mean, each union member always introduced themselves and if they had concerns as well in terms of some of the operations within the department, they would reach out and ask for, you know, meetings, kind of for me to be sort of a mediator between chiefs, if needed; but most of the time, you know, until something became tumultuous, really had positive interactions with the union.

Page 23

Q.    And so the police officers, they were employed and protected by a collective bargaining agreement; is that correct?

A.    Yes.

Q.    And who negotiated, not who the person, but which entity negotiates the collective bargaining agreement?

A.    The city has a lead negotiator and she would, at the time, I don't know if she's still there, but she is the one that would negotiate that.

Q.    And does the FPC weigh in on that issue?

A.    No.

Q.    So not only does the FPC have no control over the discipline, but the FPC also has no control over the terms and conditions that are negotiated arms length with respect to the disciplinary rules that are going to be in play pursuant to a collective bargaining agreement, too, correct?

A.    Correct.

Q.    All right.

And so it sounds like the only way for the FPC to correct an issue in the police

Page 24

department with respect to discipline is to either not promote or not appoint; is that fair?

A.    Correct.

Q.    There is no other mechanism?  The FPC can't reach in and say no, you're going to suspend that officer or no, you're going to fire that officer, correct?

A.    In the course of any of that process, if the officer from either the body felt that their discipline was not appropriate, they would also -- could file a complaint with the fire commission, and we, also, by law had to have an appeals process for them; and then they had sort of like a hearing where each entity would bring in a witness and then, ultimately, we could override the discipline of the chief as well.

Q.    Okay.

So are you saying then if an officer is disciplined they can appeal it to --

A.    To the fire and chief commission, yes.

Q.    But what about a situation where the officer is cleared of wrong doing, is there a way, mechanism for the FPC to step in and do an investigation of its own and, ultimately,

Page 25

terminate or discipline the officer in some other way?

A.    That was the first time, I believe, that when there was a discipline or there was a thought of disciplining an officer it was the first time we stepped in when we took over the investigation for Officer Mattioli in this case.

Q.    And that's sort of where I wanted to lead.

That was a very unique thing for the FPC to step in and do an investigation in the police department, correct?

A.    Yes.

Q.    And how many years had the FPC been around up until that point?

A.    Oh, my God.  You're trying to get me to go into state statute at this point.  Over 40 I would say that.

Q.    So over 40, and the commission has basically had the same type of responsibility or duty in the community, correct?

A.    Yes, and the constant change is the executive directors.  Again, they're appointed by mayor.

We were appointed for four years and

Page 26

could be reappointed and each commissioner was also appointed for five years by the mayor.

Q. Fair enough.

And this was also -- who is the police chief around the Mattioli time?

A. Alfonso Morales.

Q. So this is the first police chief in over 40 years who has had the FPC step in and remove an investigation from under a supervision, correct?

A. I can't confirm or deny 100 percent, but it was my understanding it was unprecedented for the fire and police division to take over an internal affairs from a chief.

Q. So something had to go awry or there had to be some concern that caused the FPC to step in in that capacity, correct?

A. Correct.

Q. And, surely, if you're being tasked with running the investigation and if the FPC can initiate its own investigation and hand it to you to investigate and tell you what it wants investigated, you would be -- you would have intimate knowledge of exactly the thought process of the FPC, fair?

Page 27

A. Fair, yes.

Q. So with respect to Mattioli, surely someone at the FPC said we were stepping in. You are going to be running the investigation in place of the police chief, correct?

A. Yes.

Q. And so what did they tell you? What was the reason they told you that you were going to be running this investigation as opposed to Alfonso Morales?

A. Well, at the time, right, we're talking summer of 2020, right. At that point, there had been a very tumultuous reappointment process for the chief in December of 2020. It started August of 2019. Then I think the year just set off a slew of events.

January we had a MillerCoors mass shooting and then we had George Floyd. Then we had Covid and then we had civil unrest. We had the DNC coming that summer.

So there was a lot of politics and public attention with police departments. There was also the movement to defund the police nationally as well; and so there was I would say a lot of pressure on police departments and,

Page 28

also, on oversight bodies given police brutality and what people perceived the overreach of police officers at the time.

And so locally, when an incident made national news, after George Floyd, there was a lot of public interest but also public demand for something to be done, and as the oversight body the commissioners felt that we had to do something that showed that we were going to relook at how police officers police to ensure that no more casualties happened.

Q. Okay.

But, again, the commission did reappoint Alfonso Morales, correct, in December of 2020?

A. Yes.

Q. And the expectation of Alfonso Morales was you're going to function in the capacity and perform the duties necessary of police chief, correct?

A. Correct.

Q. And one of those duties is internal investigations and discipline, correct?

A. Yes.

Q. And yet for some reason when it, you

Page 29

know, when it came, you know, game time, so to speak, there was a big investigation. The FPC lost confidence and took over the investigation, correct?

MR. MUCHE: Objection. State of mind. If you know.

MR. JACOB: Well, let's pause right there.

For, if you know, obviously, you can only ever answer a question if you know. So we, respectfully, let's just say objection because I don't want there to be an allegation that it was suggested you might not want to know which I don't think counsel was doing.

MR. STANFORD: No.

Q. So with respect to that issue, there was, there was something that said, hey, we have a police chief who's qualified, who we selected, who we put in power with the duty and responsibility of conducting internal investigations but we're not going to let him do his job, correct?

A. I can't speak for the decision and the state of mind of the commissioners.

**SA-060**

GRISELDA ALDRETE
JUNE 05, 2025
JOB NO. 1724818

Page 30

Like I said, I had no voting power in terms of decisions that the commissioners were making about police chiefs reappointments or not reappointments, hiring and firings.

Q. Understood.

But this unprecedented move of the board, steps in after 40 years for the first time with a police chief for moving an internal investigation that's high profile and saying Miss Aldrete you're going to be running this investigation and not once you asked why?

A. Well, I think we were getting a lot of -- if, I mean, no one has time to go back in time and look at everything; but we were constantly being asked by the common council where, what is the status of this investigation and would -- there is public safety meetings that each chief has to show up along with us, so they also have an opportunity to ask questions publically by the common council and the public.

And so I can't assert exactly why, you know. It wasn't like we meant to unprecedently take anything from any chief.

I think it was just at the time people were getting very frustrated of how slow

Page 31

things were moving because you must imagine, right, to hire and fire or specifically fire someone you have to do your due diligence; and I think the chief has that duty, also, to do his due diligence internally because, obviously, right, officers are protected by a union and there are a lot of moving parts in that regard as well.

Q. What I'm hearing you say is there would have been absolutely no difference in the process for the Mattioli investigation as any other internal investigation would have been conducted in the city, correct?

A. Correct.

Q. So, again, we're back to there's absolutely no difference in the process, and so the answer necessarily would be exactly what you just gave me to the common council. It's being investigated by a confident chief that we put in power to do that, and it's a process of due diligence, and this is how long it always takes. You'll have to wait.

Wouldn't that have been the answer?

A. The chief also was in front of the common council various times and in front of the

Page 32

commissioner asking those specific questions and that was the answer he said is it's being investigate.

Q. Okay.

But that wasn't sufficient for the powers that be. The commission said we're going to take over, right?

MR. STANFORD: Objection. Multiple and state of mind again.

A. Correct.

Q. Okay.

So it's correct?

And so the FPC steps in. You're asked to investigate but you don't know why you're investigating. You're just asked to investigate, correct?

A. No, I knew the charges. I knew what had happened, and so I knew what I was investigating as figuring out what had occurred that would warrant potential discipline for Officer Mattioli.

Q. No.

What I'm saying you don't know why you're the one whose been selected to investigate this. You just know you've been tasked to do so,

Page 33

correct?

A. Well, that's been always my job. Our office's job is we have investigators that, you know, investigate complaints for either department, and so no one else would have the common council nor the mayor could have authority statutorily to go in and review personnel records from any one of those officers except our office. So it wasn't me being specifically tasked.

Q. But stated another way, you were tasked with doing this internal investigation which for the first time this was happening in the department, correct?

A. I treated this investigation just like I treated every other investigation.

Q. Still that's correct?

A. Yes.

Q. All right.

And so when you met with the chief, surely, you had to meet with the former investigator, that being the chief, correct?

A. Yes.

Q. And when you sat down and said, hey, chief, I'm taking over this investigation, I'm assuming he said why?

GRISELDA ALDRETE
JUNE 05, 2025

JOB NO. 1724818

Page 82

put my email address in the chat. I should have done that earlier.

MR. LAMARR: I'm sorry. I think I sent it to --

MS. MELROOD: Jasmyne?

MR. LAMARR: I just sent that.

MS. MELROOD: Thank you.

BY MR. LAMARR:

Q.   All right.

So, Miss Aldrete, you've had an occasion to come across and at least communicate with the family of Joel Acevedo as part of your investigation with the FPC, correct?

A.   I met with the family, yes, I believe one time.

Q.   Okay.

And there were times in which you did email the family as relates to the investigation relating to Mr. Mattioli's conduct, correct?

A.   Conduct I don't recall, no.

Q.   Okay.

Do you recall ever receiving an email from a family member of Joel Acevedo?

A.   I received tons of emails during my

Page 83

tenure at FPC. Specifically to that, I can't recall.

Q.   Okay.

Do you recall sending an email to myself as part of your investigation of Mr. Mattioli?

A.   You and I were in contact because you were representing the family, yes, but I don't remember specifically the specifics of our email communications.

Q.   Okay.

You do recall as part of your investigation providing updates to myself as it relates to the nature of the investigation of Mr. Mattioli, correct?

A.   No. I don't recall specifically the content of our email communication. I'm sure you have them but I don't recall.

Q.   Do you recall verbal conversations that you made with myself regarding the investigation of Mr. Mattioli?

A.   Not at this time, no.

Q.   Okay. All right.

I want to show you what has been marked as Plaintiff's Exhibit 2, but prior to

Page 84

that point, do you recall the date -- is it fair to say that the date of the incident involving Mr. Mattioli occurred on April 19, 2020, fair?

A.   Early summer, yeah.

Q.   Okay.

And do you recall the time frame in which you took over the investigation from the Milwaukee Police Department?

A.   No.

Q.   All right. I want to show you what's been marked as Plaintiff's Exhibit No. 2.

Miss Aldrete, do you see what's been marked as Plaintiff's exhibit No. 2?

A.   I do.

Q.   Okay.

I want to now -- all right. I want to show you -- do you recall email correspondence coming from you on June 8, 2020?

A.   I'm looking at it right now.

Q.   Do you have any reason to believe that that's -- that you are the person that sent that email?

A.   I'm looking at it right now. That was my email address at the City of Milwaukee, yes.

Page 85

Q.   Okay. Great.

And -- so it's fair to say does this refresh your recollection that at least of June 8, 2020 that you were conducting an investigation on behalf of the FPC related to Mr. Mattioli, correct?

A.   Yup, I guess looking at it -- I don't know if this was specifically the time I was conducting an investigation -- the investigation, but I think what you were asking for were SOPs and that was public record that I just provided you instead of having you go through the MPD website.

Q.   Okay.

And as part of this you came in contact with myself because of your investigation of this file, correct?

A.   I can't recall if that's the reason why you reached out for the first time.

Q.   Okay.

Well, I just want to clarify, you didn't know of me or you did not have communication with me before the incident involving Joel Acevedo, correct?

A.   Correct.

SA-062

Page 86

Q.    And, at some point, you provided how personnel investigations and, also, use of force policy with the Milwaukee Police Department, correct?

A.    No, what I sent you was the SOPs that are public record can be found on Milwaukee Police Department's website.  Like I said, I just gave them to you so you wouldn't have to go look for them.

Q.    Okay.

A.    And those are the departmental policies not relating specifically to the investigation.

Q.    Okay.  Understood.

But those are department -- those are the department policies and there were conversations that were had between -- regarding the investigation of Mattioli concerning these policies, correct?

A.    No.  I would not be discussing the investigation until it's final with anyone.

Q.    Okay.

When you say you wouldn't be discussing the nature of the investigation involving anyone, what do you mean by that?

Page 87

A.    I think your question was that I was in communications with you regarding the investigation, and my lead investigator was Dianna Perez, which I think I mentioned to you, and she and I would be the ones discussing any investigation, not just this one; but an ongoing investigation is an ongoing investigation and we would not be talking about it.

Q.    Okay.

Do you know when -- I can go ahead. Pull it back from this.

Do you recall when the investigation concluded with the FPC?

A.    No.

Q.    Okay.

If I represented to you that Mr. Mattioli resigned in September of 2020, would that refresh your recollection at least to the point that the investigation was still active at that time?

A.    No, I can't recall if it was active at that time.

Q.    So would there be a reasoning why -- would there be a reason as to why your investigation would conclude before Mr.

Page 88

Mattioli's resignation from the police department?

A.    I can't.  I'm not responsible for anyone else's actions.  He knew he was being, obviously, investigated.

Q.    Well, there was a hearing at some point that the FPC set for Mr. Mattioli to attend in September of 2020, correct?

A.    I don't know if you recall, but I had tendered my intent to resign from my position in April of 2020 to everyone, and so by September -- and I was scaling back my, if you will, my duties.  I can't recall if September -- my last day -- I ended my tenure in October and I was, you know, working with the mayor to find my replacement.  So by September 2020 I can't recall if that was true or not.

Q.    So, so that we're clear, you were in place.  You were in a position as an executive director at the FPC as of October 2020, correct?

A.    No, I had resigned by then.  I was no longer with the fire and police commission or around October 20, yes.

Q.    I thought you just said you resigned in October of 2020?

Page 89

A.    Yeah, I can't -- but I don't know if it was the beginning or the end.  I can't recall. Maybe October 6th was my last day.  I can't recall but, yeah.

Q.    Okay.

So is it fair to say that in September if I represent to you that Mr. Mattioli resigned his position at that time you were still in the position as the executive director of the FPC at that point, correct?

A.    Yes.

Q.    And the FPC brought charges against Mr. Mattioli for failure to provide information related to his conduct on April 19, 2020; is that fair?

A.    That's probably a public record.  I mean, all of our meetings were televised, had an agenda.  I can't recall at this time.

Q.    Okay.

So just to be clear, the first time in over 40 years you took the lead on investigating an officer's conduct, specifically Mr. Mattioli, but you don't have recollection as to how that concluded; is that right?

A.    Well, when you say me, no.  The fire

Page 102

board of commissioners, I sent correspondence to the Milwaukee Police Department, specifically to Police Chief Morales informing them to cease all current investigations regarding Officer Mattioli"; is that right?

A.    Correct.

Q.    Okay.

And then do you recall in May or on or around May 27th of 2020 that Ann Wilson completed a citizen complaint form regarding this incident?

A.    No.

Q.    No.  Okay.

MR. MUCHE:  Give me just one second.
You know what, I didn't pull that one out.
Only just a few seconds.  I didn't pull that one out.

Q.    Now, this document is a multi-page document, and so what we'll have to do, I'll give you an opportunity to review this first page and then I can scroll down and we'll review the second page of this same document, okay.  And I may have some questions about it if that's all right?

A.    Perfect, yeah.  This is our standard

Page 103

citizen complaint form there was online.

Q.    And you would agree that at the very top it identifies the complainant as Ann Wilson, right?

A.    Yes, and she was a commissioner at the time.

Q.    Okay.
You would agree that the statement, well, can you read the statement or description of the incident that Miss Wilson provided in this complaint form.

A.    Yes.  It's on the screen.  "Describe the incident in detail.  She writes why was there a party during a pandemic?  How many people were present?  Were any attendees police officers?  Was the original investigation done properly and promptly?"

Should I keep going.

Q.    No, I think that's fair.  Let's just take a look for completeness at the second page.
Would you agree that this is signed and dated by Miss Wilson at the very bottom?

A.    If that is her signature, yes.

Q.    It purports to be, right.  You have no reason to doubt that it was her signature?

Page 104

A.    No.

Q.    Can you speak to in any way -- so the FPC took over the investigation by letter delivered on May 18th, and then nine days later a commissioner prepared a citizen complaint.

I guess -- wasn't the FPC already investigating this or help me understand chronologically how this fits together, if you can.

A.    I mean, I don't know.  I mean, again, I don't speak on behalf of commissioners.  It would -- it's like asking me why Commissioner Cocroft would send an email directly to the chief.

If, in fact, an investigation was started based on a timeline, I don't know why a commissioner would submit a citizen complaint when they were a commissioner.

Q.    Okay.  That's fair.
It's fair to say that the FPC's investigation you completed a variety of interviews in the month June of 2020, right?

A.    Per my recollection potentially, yes.  I don't know specifically that month but there was a lot of interviews, yes.

Page 105

Q.    And at some point the FPC prepared a draft charging document, right?

A.    If you have it, I'd love to look at it but would be, for any investigation we would prepare if there were going to be charges and/or out outcomes to complete the investigation, yes.

Q.    Sure.  That's fair.
Once again, for the record, is it fair to say that your recollection is exhausted with regard as to the contents of the charging documented, right?

A.    Yes.

Q.    So let's take a look.  I do have that document available to me once again.  This is a multi-page document.  I think what makes the most sense is to review the entirety of it and ascertain whether or not you recognize this document and then you can launch into some specific question, if necessary.

A.    Okay.

Q.    So I have got the first page, and then you can let me know when you've had a chance to take a look and we'll scroll from the next to the next to the next as it goes.

A.    Yes, this is on our office

SA-064

Page 106

letterhead.

Q.    Okay.

You would agree that there's a date reflected near the top of June 15, 2020, right?

A.    Yes.

Q.    So we're good with page one?

A.    We are.

Q.    Okay.

And you can just let me know when your good with each page.

A.    On my screen I can't move it up and down.  I get stuck on page 2.

Q.    Yeah -- no --

A.    Okay.  You're the one controlling it.  Okay.

Q.    Just let me know when you want to click the information button and go to the next page.

A.    Oh, yes, you can go ahead and scroll.  Sorry.  I was trying to do it on my own.  I was like I'm stuck.

Q.    Understood.

A.    I'm good.

Q.    Okay.

A.    Okay.

Page 107

Q.    Okay.

So having had a chance to review this, does this refresh your recollection a bit as to the initial draft charging document?

A.    Yes, and this would have also been prepared by my Investigator Diana Perez.  She was the one sort of collating this with me along with another city attorney's office and another attorney in my office.

Q.    Okay.

And -- so let's just return to the top here briefly, and we'll review the charges that were included, okay.

So the first charge what was under investigation was relative to a violation of the core value of integrity, and that's Rule 3 of Section 3; is that right?

A.    It's stated here, yes.

Q.    And the second --

MR. LAMARR:  I'm hearing like some background talking while a question is pending by counsel, Miss Aldrete, which is completely inappropriate.

THE WITNESS:  I'm sorry.  I'm sitting here with my attorney.

Page 108

MR. LAMARR:  I just put it on the record so it doesn't happen again.

Q.    Okay.

Moving to page 2, Miss Aldrete, the second claim under investigation was a potential violation again of the core value of integrity under Rule 3 of Section 301; is that right?

A.    Yes, the document -- I can see it on the document that you have on the screen.

Q.    Do you agree with me that the third claim under investigation was -- arose under Rule 3, Section 303?

A.    As I look at it on the screen, yes.

Q.    And the fourth arose under Rule 3 of 305; is that right?

A.    As I'm looking at it on the screen, yes.

Q.    I think we're up to number five now.

Next one appearing on the screen here on page 3 is potential violation arising under Rule 4, Section 4, "Leadership," right?

A.    I see it now, yes.

Q.    And the next one would be Rule 5, Section 501, "Respect."

You agree with that?

Page 109

A.    I see it on the screen, yes.

Q.    The next one would have been Rule 6, Section 6, "Restraint."

Do you see that that?

A.    I see it on the screen, yes.

Q.    Now, turning to page 4, there are two potential claims reflected there.  The first arising under Rule 6, Section 601, and the second arising under Rule 6, Section 602.

Do you agree with that?

A.    As I see it on the screen, yes.

Q.    And then, finally, there's a claim arising under SOP 46040 use of force related to rendering of first aid following a use of force; is that right?

A.    As I see it on the screen, yes.

Q.    So following the, the interviews that were conducted with officer and fire department witnesses present on the scene on April 19th, the FPC issued a formal charging document to Mr. Mattioli on July 10th of 2020; is that right?

A.    I believe you showed me that document earlier, yes.

Q.    So I actually have it as of now.

SA-065

Page 110

A.    Oh, okay.  You showed me multiple, sorry.

Q.    No, no, no.  That's alright.

But do you agree as to that time frame?

A.    I'm sure you have it, so probably yes.

Q.    So that's a fair point.  Okay.  So let's take a look at that together.

Same sort of process here, we'll review this document in its entirety and ensure that, that it is what it purports to be and then maybe we'll have some specific questions, okay.

So, again, this is it a multi-page document.  Let me know when you're ready to do move on to page 2.

A.    I'm ready.  I'm ready.  Okay.

Q.    So having had a chance to review that, would you agree that the three-page document I've shown you is the formal charges the FPC issued on July 10th of 2020 against Mr. Mattioli?

A.    As it appears on the screen, yes.

Q.    Okay.

And would you also agree that the

Page 111

only standard operating procedure that appeared within those formal charges arose under Section 450.65, Subpart B, Subpart 1?

A.    As I'm looking as it on the screen, yes.

Q.    So would it be fair to say that the FPC did not issue any charges under SOP460 having to do with the use of force; is that right?

A.    I don't see it on the screen, so no.

Q.    Okay.

Now, if I'm not mistaken, the directive to Chief Morales, which we looked at previously.  I believe that was Plaintiff's Exhibit No. 1, that directive was issued on July 20th of 2020, so after this charging document was generated; is that right?

A.    Yes, I have it in front of me, and it says July 20th and it was signed by me and the chairman, Steven DeVougas.

Q.    Okay.

And do you recall that, that following the issue which issued these formal charges in 2020, the FPC also issued a scheduling order relative to a trial to be held of those charges?

Page 112

A.    I don't recall but if you have it, let's see it.

Q.    Indeed.

Miss Aldrete, I've shared with you a document that appears to have been generated on FPC letterhead and appears to have your electronic signature at the bottom.

I will note there's some highlighting in here.  I believe that's native to that document.  I've not added that.

Take a moment and review this, and let me know if it refreshes your recollection as to whether a scheduling order was issued on July 10th of 2020?

A.    Yes, what I see on the screen, yes, I see it and it was signed by me by electronic signature, yes.

Q.    Okay.

And you would agree that at the bottom of that document it reflects that a trial will take place on September 11th of 2020 beginning at 8:30 a.m. at city hall; is that right?

A.    Yes, as it appears on the screen, yes.

Page 113

Q.    Okay.

Can you, can you educate me a little bit about there was testimony previously, numerous questions back and forth about what the FPC concluded or didn't conclude and, well, let me back up for a second.

It's my understanding that no trial took place in September of 2020; is that right?

A.    I can't recall but I don't believe -- I don't believe I sat it on the trial.

Q.    Okay.

So at the point the formal charges issued in July of 2020, does that mean that the investigation has revealed that there is, I don't know, sufficient evidence to go forward with these charges?

What exactly does that, does that mean?  In other words, is that the end of a process, the middle of a process?  Help me out.

A.    If we have issues charges, I would assume that we would be done and concluded most of our investigation.

Q.    Done with the investigation, but in terms of imposing discipline, that depends on the outcome at trial or something different?

Page 114

A.    Yes, and that's decided by the commissioners themselves.

Q.    Gotcha.  Okay.

And then do you recall in September of 2020 the FPC issued a press release advising that the investigation had been sent back to MPD?

A.    We sent at lot of press releases, so.

Q.    No problem.  I've got it if you're ready?

A.    I'm ready.

Q.    So I've put up a document on the screen here.  It appears to be an E notification from the fire and police commission through Milwaukee.gov's E notification system.  It appears to be dated September 2nd of 2020.

Why don't you read the first page of it and then when you've completed that we can scroll down to the second.

A.    You can go to the second page.

MR. MUCHE:  My apologies.  I think I cut this document off when I pulled it out of the PDF collection that it was in.  Let me see if I can recreate this with both pages of the document.

Page 115

MR. LAMARR:  Do you want to just take five?

MR. MUCHE:  Yes, we can definitely do that.  Sure.

(A break from the record was taken)

Q.    Miss Aldrete, once again sharing a two-page document which appears to be about press release from the fire and police commission dated September 2, 2020.  I did send this to you over the break.

Did you have a chance to review it or do you want to the review it together?

A.    I had a chance to review it.

Q.    Okay.

And having reviewed this document, is your recollection refreshed that a press release was issued on the second of September of 2020?

A.    As it appears on the screen, yes.

Q.    Okay.

And if you could, can you just read the, the title of this press release in all caps at near the top of this document.

A.    Sure.  "As new acting Milwaukee police chief conducts internal investigation into

Page 116

the Mattioli case, the fire and police collision withdraws its disciplinary hearing to allow MPD," Milwaukee Police department, "probe to move forward."

Q.    One final set of questions.

I'm going to show you, again, what was previously marked as Plaintiff's Exhibit No. 1.  Okay?

A.    Okay.

Q.    And I'm looking near the top of the page.  The second paragraph beginning with "whereas," and I'll read it and ask you if I've read it correctly:  "Whereas the board and fire police commissioners have heard an overwhelming number of requests from both the citizenry and their elected representatives to examine the Milwaukee Police Department's community-oriented policing policy, ACLU settlement agreement efforts, precautions taken in response to the Covid 19 pandemic, disciplinary process and tactics related to the department's response to civil unrest."

That is the end of much, that section, and then there is a semi-colon and the word "and."

Page 117

Did I read that correctly?

A.    As it appears on the screen yes.

Q.    Okay.

And this is the directive there was a sent to Chief Morales regarding concerns that, that the board had, in issuing directives of specific steps he's supposed to take, right?

A.    These were the requests of the commissioners, yes.

Q.    Yes, right.

Understood that it comes by and through the commissioners.

Would it be fair to say that the incident involving Officer Mattioli and Mr. Acevedo is not part of the department's community-oriented policing policy?

A.    Can you reframe the question?

Q.    I'll try it again.

A.    Yup.

Q.    The topics referenced here, so the department's community-oriented policing policy, the ACLU settlement agreement, Covid 19 precautions, disciplinary process and tactics relate to the department's response to civil unrest.

SA-067

GRISELDA ALDRETE
JUNE 05, 2025

JOB NO. 1724818

Page 118

None of those directly mention anything having to do with Mr. Mattioli or Mr. Acevedo or the incident that took place in April of 2020, correct?

A.    **Yes, as it reads on the screen now it does not include that.**

Q.    And do you have, well, let me try this again.

I'm scrolling down here to directive no. 1.  This relates to the production of MPD department record and, and I'm on page 3 of that document, if it helps.

A.    **I have it.**

Q.    Beginning on page 3 and continuing to page 4, there are some lettered subparts A through H under directive number 1, right?

A.    **Correct.**

Q.    Is it fair to say that none of those lettered subparts specifically refer to Officer Mattioli, Mr. Acevedo or the incident that occurred in April of 2020?

A.    **Correct.**

Q.    I'm now on page 4 at directive number 2.  Let me know when you're with me.

A.    **I am.**

Page 119

Q.    Okay.

Is it fair to say nothing in that paragraph refers directly to Mr. Mattioli, Mr. Acevedo or the incident that took place in April of 2020?

A.    **Correct.**

Q.    Same question as with directive number 3, which begins on page 4 and continues on to page 5 -- no, it doesn't.  I'm sorry.  Directive number 3 is entirely contained within page 4.  Directive number 4 begins the top of page 5.

A.    **Yes.**

Q.    So once again, the same question nothing having to do with directive number 3 specifically refers to Mr. Mattioli, Mr. Acevdeo or the incident that took place in April of 2020?

A.    **Correct.**

Q.    Same question as to directive number 4 on the next page.

You would agree nothing refers in there refers directly to Mr. Mattioli, Mr. Acevedo or the incident that took place in April of 2020?

A.    **Correct.**

Page 120

Q.    And directive number 5, which is captioned as reappointment contingency update, would you agree that that directive does not relate to Mr. Acevdeo, Mr. Mattioli or the incident that took place in April of 2020?

A.    **Correct.**

MR. LAMARR:  I'll put on the record plaintiff stipulates that the document speaks for itself.

MR. MUCHE:  Plaintiff's stipulate that none of these directives have anything to do with Mr. Mattioli, Mr Acevdeo or the incident from April of 220?

MR. LAMARR:  I'm not saying that.  I mean, obviously, directive number seven is specific to, well, strike that.  I will say that the document speaks for itself.

MR. MUCHE:  Sure, it does.  So I'll ask the specific questions about what it speaks to then unless you want to stipulate, but we could.  We could be done.

Q.    Directive number 6 would you agree does not specifically reference Mr. Mattioli, Mr. Acevdeo or the incident that took place in April of 2020?

Page 121

A.    **Correct.**

Q.    Directive number 7 relates to responsiveness by its caption.

Would you agree that that paragraph does not specifically reference in any way Mr. Mattioli, Mr. Acevdeo or the incident that took place in April of 2020?

A.    **Correct.**

Q.    Directive number 8, captioned as related to open records, would you agree that nothing in that paragraph references Mr. Mattioli, Mr. Acevdeo or the incident that took place in April of 2020?

A.    **Correct.**

Q.    Okay.

Continuing to page 7, there are three additional directives, numbers 9, 10 and 11.

I'm going to ask this question in a combined fashion, unless anyone has an objection, would you agree that directive 9, 10 and 11 do not specifically reference Mr. Mattioli, Mr. Acevdeo or the incident that took place in April of 2020?

A.    **I would agree that it does not.**

Case 2:23-cv-00489-BHL   Filed 09/10/25   Page 32 of 52   Document 80-8

SA-068

GRISELDA ALDRETE
JUNE 05, 2025    JOB NO. 1724818

Page 122

Q.    Okay.

MR. MUCHE:  I don't have any further questions at this time.

MR. LAMARR:  Amanda, do you have any?

MS. MELROOD:  Nothing for me.  Thank you.

MR. LAMARR:  A couple follow-ups.

EXAMINATION

BY MR. LAMARR:

Q.    Miss Aldrete, you, you -- this is to clarify.  It's the FPC that brings charges; is that correct?

A.    The fire and police commission commissioners, yes.

Q.    And you operating in the capacity of the executive director is the individual who actually brings the charges on behalf of the FPC, correct?

A.    No, we conduct an investigation, and my lead investigator is the one that brings forth the conclusion of the investigation, but I simply am sort of the conductor and, ultimately, the commission decides which charges they feel comfortable charging with.

Page 123

Q.    I see.  Okay.

I want to now show you what is I think has been previously marked as Exhibit 4; is that correct?

MR. LAMARR:  Clint, do you recall this being four?

MR. MUCHE:  That's my vague recollection, B'Ivory, and I apologize I'm not certain.

Q.    I'm going back to the document labeled fire and police commission charges authored on June of 2020.

Miss Aldrete, this is an official document of the FPC, correct?

A.    Yes, on our letterhead.

Q.    And on that letterhead it addresses your name is emboldened as executive director, correct?

A.    Yes, and then all the commissioners as well.

Q.    All right.

And this document -- I would like to ask the, the red markings is the basis of the FPC's, the rationale to support any rules that they perceived to be violated; is that right?

Page 124

A.    They're marked as evidence that would support the charges.

Q.    Okay.

And who authors that aspect of it that's in red?

A.    My investigator.  My investigator authored this.

Q.    And just for clarity for the record the name of your investigator?

A.    Diana Perez, D-I-A-N-A, Perez, P-E-R-E-Z.

Q.    Okay.

And is it fair to say that at least as of June 15, 2020, these were -- this was the position of the FPC as it relates to the investigation involving Mr. Mattioli's conduct, correct?

A.    This was the position that the commissioners felt comfortable charging, yes.

Q.    Okay.

Now, Miss Aldrete, earlier in your deposition today you testified that there were -- that you were -- you did not recall the nature of the investigation of the FPC, correct?

A.    Not in its full entirety at this

Page 125

point, no.  Five years later I do not roll.

Q.    Okay.

And looking at what is now being marked as Exhibit Number 4 authored on June 15, 2020 that provides clarity as to what the FPC was investigation Mr. Mattioli for on his conduct involved on April 19th of 2020, correct?

A.    As I'm looking at the screen.

Q.    And just for the record that's yes, correct?

A.    As I'm looking at the screen, yes. The document speaks for itself.

Q.    Okay.

And then as I go through rule number 3 that was perceived to be violated, at least as of the date of this document, it was perceived that Mr. Mattioli by his own description was effectuating an arrest on Mr. Acevdeo that was, that did not comport with departmental policy, correct?

MR. STANFORD:  Objection.  Beyond the scope of this witness' knowledge. Calls for speculation.  The document again speaks for itself.

Q.    You can go ahead.

GRISELDA ALDRETE    JOB NO. 1724818
JUNE 05, 2025

Page 126

A.    The document speaks for itself.  I am looking at it right now.

MR. STANFORD:  It's not Miss Aldrete's document.  I think people have missed the boat on that.

MR. LAMARR:  Okay.  We don't -- this is the time for your narrative.  I'm asking the deposition on Miss Aldrete.

Q.    Now, as it relates to --

MR. STANFORD:  You asked about a document that's not her document.

MR. LAMARR:  Okay.  You've made your objection and it's on the record, sir.  I'm not going to go back and forth with you.

Q.    At this point I'm clarifying what was conveyed by your investigator at such time, and I'm making sure that this is the way you interpret it, the document, as it relates to Rule No. 3.

It was that Mr. Mattioli by his own description was conducting or effectuating an arrest that did not comport with departmental policy, correct?

MR. STANFORD:  Same objections.  Also state of mind.

Page 127

A.    I think the document speaks for itself.

Q.    Okay.

I'm not asking about what you believe the document speaks for.

I'm asking your interpretation of what is under Rule No. 3.

You understand that to be that Mr. Mattioli was effectuating an arrest that did not comport with departmental policy; am I incorrect?

A.    I'm looking at what you are reading.

Q.    And is that your interpretation of what this means?

A.    Yeah, I'm looking at what you're reading.  I mean, I think we had an investigator that helped lead the investigation.

Q.    And part of that investigation was that Mr. Mattioli in his admission of effectuating an arrest did not comport with departmental policy, correct?

MR. STANFORD:  Same objections.

Q.    I'm sorry.

A.    Yeah, the document speaks for itself.  If we wrote it at the time and the

Page 128

investigator and that's what we presented to the commissioners, ultimately, they have the ultimate discretion to issue those charges.

Q.    Okay.

And, just to be clear, I'm not incorrect in my assertion that Mr. Mattioli's own admission of effectuating an arrest did not comport with departmental policy.  That's why it is a violation here under Rule No. 3, correct?

A.    I'm not going to speak for Mattioli's action.

Q.    Okay.

As it relates to the charges regarding Mr. Mattioli's action, this Rule No. 3 -- in order to violate number 3, there has to be a violation of a departmental policy; is that correct?

A.    In order to violate any SOP policy there has to be a perceived violation.

Q.    And it has to be a perceived violation of an officer, correct?

A.    By any member of the fire or police department.

Q.    That was acting on duty, correct?

A.    Sure.

Page 129

Q.    All right.  I want to now show you what has been marked as --

MR. JACOB:  B'Ivory, could you just please check your phone for a minute just before you move on to the next topic.  Sorry.

Q.    All right.

So, just so we can get some context as to this document authored on June 15, 2020, in order to issue charges there has to be a fact investigation performed, correct?

A.    Yes.

Q.    Okay.

And at the conclusion of the fact investigation is the point in which charges are now considered at that point; isn't that right?

A.    Yes.

Q.    And the commissioners then review the evidence and then make a determination as to which charges to issue?

A.    Which charges they feel comfortable in issuing, yes.

Q.    I want to now show you one last document.  One second.

I'm now showing you what has been

SA-070

Page 138

                    C E R T I F I C A T E


        I, MICHAEL WILLIAMS, a Registered

Professional Reporter and Notary Public, do

hereby certify that prior to the commencement of

the examination, the witness was duly sworn by me

to testify to the truth, the whole truth and

nothing but the truth.

        I DO FURTHER CERTIFY that the foregoing is

a true and accurate transcript of the testimony

as taken stenographically by and before me at the

time, place and on the date hereinbefore set

forth, to the best of my ability.

         I DO FURTHER CERTIFY that I am neither a

relative nor employee nor attorney nor counsel of

any of the parties to this action, and that I am

neither a relative nor employee of such attorney

or counsel, and that I am not financially

interested in the action. June 18th, 2025


MICHAEL WILLIAMS, RPR



**Fire and Police Commission**

**Steven M. DeVougas**
Chair

**Nelson Soler**
Vice-Chair

**Ann Wilson**
**Fred Crouther**
**Angela McKenzie**
**Everett Cocroft**
**Raymond Robakowski**
Commissioners

**Griselda Aldrete**
Executive Director

# FIRE AND POLICE COMMISSION
# CHARGES

June 15, 2020

AGAINST: Michael Mattioli
RANK POSITION: Police Officer
P.S. #017921

Page 1 out of 5

## VIOLATION OF DEPARTMENT RULES AND PROCEDURES AS FOLLOWS:

### CHARGES

<u>**RULE 3, SECTION 3.00- INTEGRITY-**</u> We recognize the complexity of police work and exercise discretion in ways that are beyond reproach and worthy of public trust. Honesty and truthfulness are fundamental elements of integrity. It is our duty to earn public trust through consistent words and actions. We are honest in word and deed.

<u>Evidence:</u> PO Mattioli did not exercise discretion in choosing to violate State and local orders relating to COVID-19 restrictions and deciding to host a gathering on the evening of April 18, 2020 and into the morning hours of April 19, 2020. Additionally, PO Mattioli chose to use his law enforcement training to restrain Mr. Joel Acevedo with a result that was disproportionate to the alleged danger to himself or his property.



**Fire and Police Commission**

Griselda Aldrete
Executive Director

Steven M. DeVougas
Chair

Nelson Soler
Vice-Chair

Ann Wilson
Fred Crouther
Angela McKenzie
Everett Cocroft
Raymond Robakowski
Commissioners

<u>**RULE 3, SECTION 3.01- INTEGRITY**</u>- Our behavior shall inspire and sustain the confidence of the community. Whether on or off duty, department members shall not behave in such a way that a reasonable person would expect that discredit could be brought upon the department, or that it would create the appearance of impropriety or corruptive behavior.

<u>Evidence</u>: Per the statements of several MPD personnel who had direct contact with PO Mattioli on Sunday, April 19, 2020 and per his own recorded body cam admission to PO Bouzek while on the back his squad, PO Mattioli appeared significantly impaired and did not realize the gravity of his actions against Mr. Acevedo. PO Mattioli during various intervals, caught on body cam and interview records, became agitated, belligerent and disrespectful to various MPD personnel and District Attorney investigators.

<u>**RULE 3, SECTION 3.03**</u>- Police members shall exercise powers of arrest, search, seizure and surveillance only when its lawful, necessary and proportionate to do.

<u>Evidence</u>: Per PO Mattioli's own description, he was effecting an arrest on Mr. Acevedo who he claims was in the process of stealing from his pant pockets. When PO Mattioli was later booked in custody, he was in possession of $60 dollars. His arrest attempt resulted in great bodily harm.

<u>**RULE 3, SECTION 3.05**</u>- Department members shall obey local ordinances and state and federal laws, whether on or off-duty. Any violation of ordinances or laws in any jurisdiction shall be reported to the member's supervisor as soon as practical.

<u>Evidence</u>: PO Mattioli hosted a gathering in his home on April 18, 2020 with three friends who did not live with him in his home, ███████████████ Milwaukee, WI 53219. At that time, the State of Wisconsin was under Emergency Order No. 12 due to COVID-19 (effective March 25, 2020), which specifically states, *"All public and private gatherings of any number of people that are not part of any single household or living unit are prohibited."* The City of Milwaukee issued a companion order prohibiting the same (effective date March 25, 2020).



**Fire and Police Commission**

Griselda Aldrete
Executive Director

Steven M. DeVougas
Chair

Nelson Soler
Vice-Chair

Ann Wilson
Fred Crouther
Angela McKenzie
Everett Cocroft
Raymond Robakowski
Commissioners

**RULE 4, SECTION 4.00- LEADERSHIP**- We seek to influence human behavior to achieve organizational goals that serve the public while developing individuals, teams and the organization for future service. We accept our responsibility to be leaders, both within the community and among our peers, and for the actions of our colleagues and ourselves. We are all responsible for the performance, reputation and morale of the department.

Evidence: PO Mattioli is a 13-year veteran of the Milwaukee Police Department (MPD) beginning his career as a Police Aide. MPD should be able to expect officers with this level of experience to be leaders and mentors to other MPD personnel and the wider community they serve. PO Mattioli was profane, belligerent and disrespectful towards other MPD personnel including higher-ranking officers and District Attorney investigators.

**RULE 5, SECTION 5.01- RESPECT** -Department members shall treat the public and each other with courtesy and professionalism. Civility and patience are valued attributes, while profane or insolent language or actions undermine the public's confidence.

Evidence: PO Mattioli was profane, belligerent and disrespectful towards other MPD personnel including higher-ranking officers and District Attorney investigators.

**RULE 6, SECTION 6.00- RESTRAINT**- We use the minimum force and authority necessary to accomplish a proper police purpose. We demonstrate self-discipline, even when no one is listening or watching.

Evidence: Per PO Mattioli's recorded statements on body cam he states he was affecting an arrest which resulted in great bodily harm. Based on PO Mattioli's statements at the scene the morning of April 19, 2020, Mr. Acevedo was a permitted guest and friend. Per the statements of responding MPD and Milwaukee Fire Department (MFD) personnel who responded to the scene, the subject (Mr. Acevedo) of the arrest was found in the kitchen immediately in front of a side, exterior door. Recorded body cam statements made by one of the witnesses (Andrew Janowski) who was at the gathering states that Mr. Acevedo had "nearly left the house and he was brought back in and they laid on his legs so he would not get away" (body cam footage from PO Romero-Perez No. 2, time stamp: 2:18 seconds).

SA-074



**Fire and Police Commission**

Griselda Aldrete
Executive Director

Steven M. DeVougas
Chair

Nelson Soler
Vice-Chair

Ann Wilson
Fred Crouther
Angela McKenzie
Everett Cocroft
Raymond Robakowski
Commissioners

**RULE 6, SECTION 6.01**-Police members shall exercise restraint in the use of force and act in proportion to the seriousness of the offense and the legitimate law enforcement objective to be achieved.

Evidence: Per PO Mattioli's own description, he was effecting an arrest on Mr. Acevedo who he claims was in the process of stealing from his pant pockets. When PO Mattioli was later booked in custody, he was in possession of $60 dollars. His arrest attempt resulted in great bodily harm.

**RULE 6, SECTION 6.02**- Members shall not subject any person to torture or cruel, inhumane, or degrading treatment of punishment. No circumstances whatsoever may be invoked as a justification for torture or other cruel, inhumane, or degrading treatment or punishment.

Evidence: Per the 911 call which began at 7:28 a.m. and lasted 3 minutes and 35 seconds, PO Mattioli was seeking help for an altercation that occurred in his home. PO Mattioli is heard on the 911 call stating he is an off-duty police officer and he needs help at his house. On the call, gasping and a struggle can be heard. A voice on the call can be heard stating, *"we got him Michael, don't worry,"* believed to be Mr. Janowski. PO Mattioli continued to restrain Mr. Acevedo despite clear signs of having gained control of Mr. Acevedo and audible sounds of distress. Per PO Roach, one of the first to arrive to the scene with his partner PO Sheremeta, PO Mattioli had to be commanded several times to disengage and was physically pulled off Mr. Acevedo's back by PO Roach, even after multiple police officers has responded to the call.

SA-075



**Fire and Police Commission**

Griselda Aldrete
Executive Director

Steven M. DeVougas
Chair

Nelson Soler
Vice-Chair

Ann Wilson
Fred Crouther
Angela McKenzie
Everett Cocroft
Raymond Robakowski
Commissioners

## SOP 460.40: USE OF FORCE- RENDERING FIRST AID FOLLOWING USE OF FORCE

Following the use of lethal or less lethal weapons, or other applications of force, members shall render or request medical aid, if needed or if requested by anyone, as soon as reasonably possible. This may include detecting obvious change in condition or behavior, clearing chemical agents from the eyes, providing first aid, evaluation by emergency medical services or immediate aid by medical professionals.

Evidence: While it was recorded that the 911 call was placed from PO Mattioli's cell phone at 7:28 a.m. on April 19, 2020, he did not request medical assistance. He requested police backup to what he characterized as an arrest of someone stealing from his person. Based on the background of the 911 call, Mr. Acevedo was conscious and speaking when the call was first placed. During the course of the call, signs of distress including gasping and snorting are audible. The body cam recordings of the first arriving officers (PO Roach and PO Sheremeta) show Mr. Acevedo was laying face down with PO Mattioli straddling his neck in what has been described as a rear naked chokehold while Mr. Janowski restrained Mr. Acevedo's legs. There was an obvious change in Mr. Acevedo's condition that would require rendering immediate first aid and calling for medical attention. PO Mattioli did neither.

SA-076

BOARD OF FIRE AND POLICE COMMISSIONERS
OF THE CITY OF MILWAUKEE

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

In the matter of the citizen complaint against
MICHAEL MATTIOLI

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

TO THE HONORABLE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY
OF MILWAUKEE:

Now comes Griselda Aldrete, Executive Director of the Fire and Police Commission of the City
of Milwaukee, and refers the following charges against POLICE OFFICER MICHAEL
MATTIOLI for trial, pursuant to FPC Rule XV § 4, to resolve a citizen complaint filed on May
27, 2020.

CHARGE

Core Value 3.00 – Integrity

> We recognize the complexity of police work and exercise discretion in ways that are
> beyond reproach and worthy of public trust. Honesty and truthfulness are fundamental
> elements of integrity. It is our duty to earn public trust through consistent words and
> actions. We are honest in word and deed.

Referencing Guiding Principle 3.05

> Department members shall obey local ordinances and state and federal laws, whether on
> or off-duty. Any violation of ordinances or laws in any jurisdiction shall be reported to
> the member's supervisor as soon as practical.

SPECIFICATION

On April 19, 2020, Milwaukee Police Department members responded to a call for service at the
home of Officer Michael Mattioli, regarding an altercation between Mattioli and a guest in his
home, later identified as Joel Acevedo. Mattioli was subsequently taken into custody and
Acevedo was admitted to St. Luke's Hospital's Emergency Department in the City of Milwaukee
for treatment of significant injuries. Acevedo subsequently died.

Mattioli was observed by the first responding officers, and a body worn camera, to be on top of
Acevedo, who was face down, holding Acevedo in what was described as a "rear naked choke
hold" – where Mattioli's right arm was encircled around Acevedo's neck, and secured with his
left arm. Mattioli was asked if Acevedo was breathing, and he indicated that he did not know.
Mattioli was told several times to let go and get off of Acevedo before he complied. The officer

1

**SA-077**

then checked the vitals of Acevedo and found him to not have a pulse or to be breathing. The officers immediately began CPR.

Mattioli spoke to an officer on the scene and stated the following: He woke up to Acevedo going through his (Mattioli) pockets and believed that Acevedo was trying to steal from him. Mattioli confronted Acevedo and told him to leave. Acevedo did not leave, but rather punched one of the other two guests in the home at that time. Mattioli restrained Acevedo with the assistance of one of his guests and called 911. Mattioli held Acevedo until the police showed up.

Mattioli admitted to being intoxicated. Mattioli admitted to holding Acevedo by his neck, but indicated that he did not squeeze because he knew what constitutes deadly force and what does not. Mattioli stated he was not trying to cut off Acevedo's air, but was just trying to hold him until police arrived.

On April 28, 2020, Milwaukee County Chief Medical Examiner Dr. Brian Peterson performed an autopsy on the body of Acevedo. The doctor concluded that the cause of death was "Anoxic Encephalopathy due to Traumatic Asphyxia." Dr. Peterson ruled the manner of death as "Homicide."

On May 13, 2020, the District Attorney's Office charged Mattioli with violating Wis. Stat. § 940.02 – First-Degree Reckless Homicide, in the death of Acevedo. That charge is pending at the time of the filing of this referral; however, there is sufficient evidence to suspect that Mattioli may have committed numerous crimes in his actions concerning Acevedo, including a violation of Wis. Stat. § 941.30 – Recklessly Endangering Safety, in either the first or second degree, in addition to First-Degree Reckless Homicide, which may be worthy of disciplinary action.

CHARGE

Core Value 5.00 – Respect

We hold life in the highest regard. We treat all citizens and colleagues with dignity and respect, and are fair and impartial as we perform our duties.

Referencing Guiding Principle 5.03

Members shall promptly obey any proper or lawful order emanating from any officer of higher rank. Any improper or unlawful order should be reported to a supervisor of higher rank.

MPD Standard Operating Procedure 450.65(B)(1)

Fire and Police Commission Investigations

1. Department members will, within seven (7) days, fully and truthfully respond to all inquiries from the executive director of the FPC, or his/her designee, who is investigating citizen complaints or citizen inquires made through the FPC.

2

2.  If a member is under investigation for an alleged violation of the Code of Conduct, FPC rules, or standard operating procedures and is subject to an interview that could lead to disciplinary action, such interview by the FPC investigator or executive director of the FPC will comply with the requirements set forth in SOP 450.35(D) Informing the Member Procedure. The form FPC-21 *Informing the Member Report* will be used by the FPC in place of the department form PI-21.

### SPECIFICATION

Mattioli was served with an FPC-21 Compelled Statement form on June 25, 2020 at 9:09 PM, with Mattioli's attorney accepting and acknowledging service, ordering Mattioli to appear for a compelled statement personnel interview to be conducted on July 2, 2020, pursuant to SOP 450 and associated SOPs and rules. The order notified Mattioli that failure to appear could subject him to discipline, up to and including termination. On June 29, 2020, Mattioli's attorney advised that Mattioli would refuse to appear for the interview**, and accordingly, Mattioli did not appear as ordered on July 2, 2020**.

A copy of the citizen complaint filed against Police Officer Michael Mattioli is attached. In the interest of public welfare, good order of the City, and for the good of the police service, I refer the citizen complaint for trial for a fact finding hearing and the determination of appropriate discipline, if any, consistent with these charges.

Dated at Milwaukee, Wisconsin this **10 day of July 2020**.

_____
Griselda Aldrete, Executive Director
Milwaukee Fire and Police Commission

Attachment (1)

**SA-079**